122 T.C. No. 8


UNITED STATES TAX COURT


DELBERT L. AND MARGARET J. BAKER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 448-02.                    Filed February 19, 2004.


Ps and AFVW executed a residence agreement entitling Ps to lifetime residence at VW. VW provides four different levels of accommodations. During the years in issue, Ps resided in an independent living accommodation which provides the lowest level of care and resembles a regular residence that can be found in any nonretirement living community. Ps paid monthly service fees of $2,170 and $2,254 for 1997 and 1998, respectively. Several amenities were available to Ps, including medical services and the use of pool, spa, and exercise facilities.

D, the vice president of finance for AFVW, the operator of VW, calculated the portions of the monthly service fees paid by independent living residents that were allocable to medical care. C, an ad hoc committee, of which P-H was a member, reviewed D's calculations. On the basis of certified financial information provided by AFVW, C calculated a higher amount allocable to medical care. Both D and C used the percentage method to calculate the portions

allocable to medical care.  Ps claimed medical deductions based on C's calculations, and also claimed additional deductions as a result of P-H's use of the pool, spa, and exercise facilities.

R audited Ps and issued a notice of deficiency determining deficiencies on the basis of D's calculations, and also disallowing the deductions for use of the pool, spa, and exercise facilities.  R subsequently sought the advice of an actuary and, on the basis of the actuary's report, now claims that the actuarial method must be used to determine the portion allocable to medical care.  The actuary provided calculations using both the actuarial method and the percentage method.  Ps rely on C's calculations and a supplemental report prepared by P-H.

Held:  Ps are not required to use the actuarial method and may use the percentage method to determine the portions of the monthly service fees that are allocable to medical care.

Held, further:  Sec. 7491(a), I.R.C., places the burden of proof on R in certain situations.  R concedes that Ps have satisfied the requirements of sec. 7491(a)(2), I.R.C.  Ps submitted credible evidence under sec. 7491(a)(1), I.R.C., with regard to the factual issue of the portions of monthly service fees allocable to medical care.  Ps did not submit credible evidence regarding claimed deductions for use of the pool, spa, and exercise facilities.  Therefore, R bears the burden of proof on the monthly fees issue but not on the facilities issue.

Held, further:  Sec. 213(a), I.R.C., allows deductions for expenditures for medical care, subject to certain limitations.  Using the percentage method, the annual amounts of monthly service fees paid by Ps that are allocable to medical care are $7,766 and $8,476 for 1997 and 1998, respectively.  Ps are not entitled to additional deductions for use of the pool, spa, and exercise facilities.


Delbert L. Baker and Margaret J. Baker, pro sese.

Guy H. Glaser and Vicken Abajian, for respondent.

GOEKE, Judge:  Respondent determined deficiencies in petitioners' Federal income taxes of $983 and $1,252 for the taxable years 1997 and 1998, respectively.  After a concession,[1] the issues for decision are:  (1) What portions of monthly services fees paid by petitioners for lifetime residence at a continuing care retirement community are allocable to medical care under section 213;[2] and (2) whether petitioners are entitled to deduct additional amounts under section 213 for medical use of pool, spa, and exercise facilities at the retirement community. We hold that the portions of the monthly service fees paid by petitioners for medical care were $7,766 and $8,476 for 1997 and 1998, respectively.  We further hold that petitioners are not entitled to any deductions for 1997 and 1998, respectively, for the use of the pool, spa, and exercise facilities.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are

---

[1]Petitioners concede that they are not entitled to claim as a depreciation expense $595 of the $775 reported on their 1997 return.  Respondent's determination with respect to 1997 includes a computational adjustment to petitioners' Social Security benefits and/or Tier I Railroad Retirement benefits based on other changes to adjusted gross income.  This adjustment will be taken into account by the parties in the Rule 155 computation.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Dollar amounts are generally rounded to the nearest dollar.

incorporated herein by this reference. Petitioners, Mr. Baker and Mrs. Baker, resided in Riverside, California, at the time they filed their petition.

## I. Background

On December 22, 1989, petitioners and Air Force Village West, Inc. (AFVW) executed a residence agreement entitling petitioners to a lifetime residence at Air Force Village West (Village West). AFVW is a nonprofit organization that was incorporated in the State of California on September 21, 1984. AFVW was organized to establish, maintain, endow, and operate continuing care retirement communities (CCRCs) for officers (and their spouses and qualified dependents) of the U.S. uniformed services who are more than 60 years old and have been retired or honorably separated from active duty. Village West is one of the CCRCs owned and operated by AFVW. Village West is a gated, guarded, perimeter-fenced, resortlike retirement community located on 153 acres of land in Riverside, California.

### A. Construction of Village West

The construction of Village West occurred in three phases. The first phase involved the construction of the following living units and health care facilities: (1) Independent Living Unit (ILU) apartments, duplexes, and cottages; (2) an Assisted Living Unit (ALU) facility with 20 rooms; (3) a Skilled Nursing Facility (SNF) with 59 beds; (4) a Commons building with a suite of rooms

set aside, in part, for an outpatient medical services clinic; (5) an F-Wing of apartment units; (6) a G-Wing of apartment units; (7) a pool area with Jacuzzi; (8) a maintenance and housekeeping building; (9) a mechanical building; and (10) an outside courtyard. The first phase was substantially completed in December 1989, and initial operation began, and the first residents moved in, at that time.

The second phase of the construction of Village West involved the construction of the following additional housing, administration, and maintenance buildings: (1) A landscape building; (2) administrative offices located at the Commons building; and (3) additional ILU cottages. The second phase was completed in October 1993 and started operation at that time.

The final phase of the construction of Village West involved the expansion of the existing ALU facility and the construction of a new Special Care Unit (SCU) facility. The final phase was completed in June 1997 and started operation at that time.

B.    Living Accommodations at Village West

Village West provides the following four different levels of living accommodations: (1) Independent living, or ILU; (2) assisted living, or personal care (previously referred to as ALU); (3) special care, or SCU (Alzheimer's/Dementia unit); and (4) skilled nursing, or SNF. The ALU, SCU, SNF, and outpatient medical services clinic are located in one building which also

houses the administrative offices of AFVW, the dining room, and apartment units.  This building is known as the Village West Health Center and is also called the Commons building.  During the years in issue, the Village West Health Center was available for patient use by both residents of Village West (hereinafter sometimes referred to as AFVW residents) and nonresidents of Village West who lived in the surrounding community (hereinafter referred to as noncontract patients).  Noncontract patients were charged higher rates for use of the Village West Health Center and certain services were billed to them on a fee-for-service basis.

1.    Independent Living Units

The ILU apartments, duplexes, and cottages are designed for normal, everyday independent living of AFVW residents, and resemble regular residences that can be found in any nonretirement living community.  All ILUs are initially equipped with miniblinds, wall-to-wall carpeting, and standard kitchen appliances.  These are paid for by AFVW.

During 1997 and 1998, several amenities were available to AFVW residents living in the ILUs, including:  (1) An emergency-pull-cord system installed in each ILU; (2) complete building and grounds maintenance; (3) weekly housekeeping services; (4) a 24-hour front desk service; (5) access to a fitness center, available for medical therapy, with spa and exercise areas; (6)

an indoor/outdoor swimming pool and Jacuzzi; and (7) complete patient access to all on-campus health services provided in the Village West Health Center. Beginning in June 1997, AFVW residents living in ILUs gained access as patients to the newly opened SCU also located in the Village West Health Center.

The front desk is staffed 24 hours a day and is the focal point for information, service, and assistance to residents. One of the duties of the front desk was monitoring and responding to the emergency-pull-cord system installed in the ILUs and other areas of AFVW where the system is in place. The emergency-pull-cord system was connected directly to the front desk and a crisis nurse, an assistant, and a security guard would be dispatched to the ILU if necessary.

During the years in issue, Mr. Baker used the pool, spa, and exercise facilities at Village West. Petitioners, like other AFVW residents, were not charged a separate fee to use these facilities.

### 2. Assisted Living Units

The ALU facilities represent an intermediate step between independent living and the need for a higher level of care; i.e., skilled nursing care. The ALUs are designed for two types of individuals. They are designed for individuals who are unable to leave a building unassisted under emergency conditions, including but not limited to, individuals who depend on mechanical aids

such as crutches, walkers, and wheelchairs and who are unable or likely to be unable to respond physically or mentally to an emergency situation such as a fire. The ALUs are also designed for individuals who need care and supervision with the activities of daily living, such as eating, bathing, and dressing. The ALUs are designed to provide occupants with a comfortable, homelike atmosphere where they are encouraged to provide their own furniture, bedding, and linens.

During the years in issue, both AFVW residents and noncontract patients occupied rooms as patients in the ALU facilities. AFVW residents who became patients in the ALUs received a 60-percent discount off the regular rate charged to noncontract patients who occupied similar units as patients.

### 3.  Special Care Units

The SCU at Village West is a special unit designed to provide living accommodations to individuals with diagnosed Alzheimer's disease and/or similar forms of irreversible dementia. Admission is based strictly on doctor's orders. The SCU is fully enclosed, can only be accessed through a security-locked door, and is manned 24 hours per day by nursing staff members. Patients in the SCU are provided the same services as the individuals occupying the ALUs. Additionally, other programs are provided which are specially geared to enhancing the dignity and lifestyle of patients during the remainder of their lives.

During the years in issue, both AFVW residents and noncontract patients occupied rooms as patients in the SCU. AFVW residents who became patients in the SCU received a 60-percent discount off the regular rate charged to noncontract patients who occupied similar units as patients.

### 4. Skilled Nursing Care

The SNF at Village West provides the highest level of care of all the health care facilities located at Village West. Admission to this facility is based strictly on doctor's orders. The accommodations provided in the SNF include a skilled nursing facility bed, 24-hour nursing care, and three meals per day. In addition, occupants of the SNF receive services such as long-term maintenance care, necessary diagnostic care, preventative care, therapeutic care, and rehabilitative care required by the chronically ill.

During the years in issue, both AFVW residents and noncontract patients occupied rooms as patients in the SNF. AFVW residents who became patients in the SNFs received an approximately 50-percent discount off the regular rate charged to noncontract patients who occupied similar units as patients.

### C. The Residence Agreement

Petitioners chose a 1,427-square foot, two bedroom, two bathroom, duplex unit for their ILU accommodations. Under the residence agreement executed on December 22, 1989, they were

required to pay certain fees in exchange for a lifetime residence at Village West. Petitioners were required to pay: (1) A nonrefundable processing fee of $500; (2) an entrance fee of $130,015; and (3) an initial monthly service fee of $1,418, which was subject to annual increases by AFVW.[3] The residence agreement states that in the case of two individual AFVW residents, the entrance fee is considered paid one-half by each. Petitioners deducted $34,541 of the entrance fee as a medical expense on their jointly filed 1989 tax return.[4] Petitioners paid monthly service fees to AFVW of $2,170 and $2,254 for 1997 and 1998, respectively.

Under the terms of the residence agreement, petitioners were guaranteed several amenities in exchange for their payment of monthly service fees, including: (1) The emergency-pull-cord system; (2) 24-hour availability of a licensed nurse from the SNF to respond to medical emergencies; (3) outpatient and other non-life-threatening nursing services provided at the Village West Health Center outpatient medical services clinic by their nursing

---

[3]The residence agreement does not indicate how the entrance fee would be used by Village West. An independent auditor's report of AFVW provides that the entrance fees, net of the portion that is refundable to the residents, are recorded as deferred revenue and amortized into income. The portion of the entrance fees that is estimated to be refundable is reflected as a liability on the statements of financial position.

[4]The record does not indicate how this figure was calculated.

staff; and (4) a guaranty from AFVW of a bed in the Village West units or SNF and that the fees charged for use of the unit or the facility would be at a reduced rate from the standard fees charged to noncontract patients occupying such facilities. The residence agreement is silent as to the amount of the fee reduction for use of the units or the facility.

Under the terms of the residence agreement, AFVW could require that petitioners be transferred to a different level of living accommodation if certain medical conditions existed. Additionally, the terms of the agreement provided that petitioners were entitled to lifetime care.

II. AFVW's Financial Information and Calculation of Deductible Medical Expenditures

A. AFVW's Financial Information for 1997 and 1998

In a report entitled "Air Force Village West - Health Facility Information" (hereinafter referred to as the report or the Health Facility Information report), Charles L. Dalton (Mr. Dalton), vice president of finance for AFVW, certified that financial information, allocation tables, and supplemental accounting data contained in the report had been compiled from the accounting records of AFVW. The report included information for the years ended December 31, 1997, and December 31, 1998.

The following chart represents various revenue and expense items for 1997 listed in the report:

## REVENUES

| Description | Amount |
| --- | --- |
| Monthly fees | $7,979,906 |
| Entrance fee revenue | 2,978,303 |
| Entrance fee terminations | 551,616 |
| Resident ALU fees | 301,321 |
| Noncontract patient ALU fees | 80,156 |
| Resident SCU fees | 55,445 |
| Noncontract patient SCU fees | 3,640 |
| Resident SNF fees | 470,787 |
| Noncontract patient SNF fees | 1,207,747 |
| Investment income | 2,890,228 |
| Gain from sale of securities | 107,335 |
| Net, direct billings | 355,185 |

## EXPENSES

| Description | Amount |
| --- | --- |
| Total operating expenses | $16,069,104 |
| Total interest expense | 4,797,339 |
| Total depreciation and amortization | 2,161,331 |
| Total issue cost | 98,395 |
| Total environmental services | 1,028,776 |
| SNF expenses | 3,044,041 |
| ALU and SCU expenses | 929,275 |

Various SNF revenue and expenses for 1997 were listed as follows:

### REVENUES

| Description | Amount |
|---|---|
| SNF room and board, private/Medicare/ HMO fees for residents | $795,567 |
| SNF room and board, private/Medicare/ HMO fees for noncontract patients | 1,207,747 |
| SNF ancillary services, Medicare/HMO billings for residents | 365,444 |
| SNF ancillary services, Medicare/HMO billings for noncontract patients | 448,462 |

### EXPENSES

| Description | Amount |
|---|---|
| Direct Expenses: | |
| Food service | $163,348 |
| Payroll and benefits | 1,342,771 |
| Departmental costs | 214,727 |
| Patient charges | 726,229 |
| | |
| Purchased Services: | |
| Housekeeping and laundry | 99,092 |
| Food service (benefits) | 22,106 |
| Maintenance | 39,316 |
| Landscape | 29,833 |
| Administration | 123,011 |
| Insurance | 21,970 |
| Linens | 8,403 |
| Depreciation and amortization | 211,343 |
| Contracts | 8,206 |
| Utilities | 33,686 |
| | |
| Total expenses | 3,044,041 |

The following chart represents various revenue and expense items for 1998 listed in the report:

REVENUES

| Description | Amount |
|---|---|
| SNF room and board, private/Medicare/ HMO fees for residents | $585,802 |
| SNF room and board, private/Medicare/ HMO fees for noncontract patients | 1,315,694 |
| SNF ancillary services, Medicare/HMO billings for residents | 315,969 |
| SNF ancillary services, Medicare/HMO billings for noncontract patients | 378,905 |

EXPENSES

| Description | Amount |
|---|---|
| Total operating expenses | $17,759,058 |
| Interest expense | 4,669,121 |
| Depreciation and amortization | 2,321,300 |
| Issue costs | 107,134 |
| Total environmental services | 1,030,677 |
| SNF expenses | 3,330,031 |
| ALU expenses | 984,333 |
| SCU expenses | 796,306 |

In a separate document (hereinafter referred to as the 1998 financial document) that should have been included in the Health Facility Information report because it represents the most accurate data, the following relevant revenue and expense items were listed for 1998:

REVENUES

| Description | Amount |
|---|---|
| Monthly fees | $8,329,241 |
| SNF noncontract patient fees | 1,301,382 |
| ALU noncontract patient fees | 104,083 |
| SCU noncontract patient fees | 110,202 |

EXPENSES

| Description | Amount |
|---|---|
| Total operating expenses | $16,986,770 |
| Interest expense | 4,704,320 |
| Depreciation and amortization | 2,338,558 |
| Issue costs | 107,134 |
| Total environmental services | 1,020,109 |

Various SNF expenses for 1998 were listed in the Health
Facility Information report as follows:

### REVENUES

| Description | Amount |
|---|---|
| SNF resident fees | $585,802 |
| SNF noncontract patient fees | 1,315,694 |
| SNF Medicare/HMO billings for residents | 315,969 |
| SNF Medicare/HMO billings for noncontract patients | 378,905 |
| SNF other | 15,696 |
| Home care | 49,578 |

### EXPENSES

| Description | Amount |
|---|---|
| Direct Expenses: | |
| Health services - payroll and benefits | $374,008 |
| SNF - payroll and benefits | 964,802 |
| Clinic - payroll and benefits | 120,955 |
| SNF - departmental expenses | 197,028 |
| Clinic - departmental expenses | 40,446 |
| Patient chargeables | 677,894 |
| Depreciation | 166,303 |
| Insurance | 32,531 |
| Utilities | 26,073 |
| Contract | 3,055 |
| | |
| Purchased Services: | |
| Corporate administration | 125,684 |
| Environmental services | 144,295 |
| Food services | 381,040 |
| Maintenance | 36,111 |
| Landscaping | 30,306 |
| Linens | 9,500 |
| | |
| Total expenses | 3,330,031 |

Similar charts were included detailing an allocation of expenses to the ALU and SCU.  The report states that the SNF, ALU, and SCU expense information listed above does not include an allocation of amortization of debt issue cost, amortization of preopening cost, or an allocation of interest expense.  Specific expenses associated with the pool, spa, and exercise facilities at Village West are not identified in the financial information in the report.

In allocating expenses to the SNF, the following explanation was provided:

| Line Item | Description |
| --- | --- |
| Food service | Percent of total contract |
| Payroll and benefit | Direct labor costs plus benefits |
| Departmental costs | All expenses in specific dept., except payroll and benefits |
| Housekeeping and laundry | Percent of total contract |
| Food service | Benefits of employees directly allocated to cost center |
| Maintenance | A specific employee dedicated to the health care facility |
| Landscape | Based on previous time study |
| Administration | Based on previous time study |
| Insurance | Policies directly related to facility plus 10 percent of other policies |
| Linens | Linens purchased directly for the SNF |
| Depreciation and amortization | Directly from the fixed asset program |
| Contracts | Alarm system, copiers, fire drill, Medical Director, etc. (No ancillary contractors) |
| Utilities | 10 percent of the total utilities for AFVW |
| Interest expense | 10 percent of total interest expense for AFVW |

The explanation notes that allocations for ALUs and SCUs are the same except for maintenance, landscaping, administration, insurance, contracts, utilities, and interest, which were allocated on the basis of two-thirds of the SNF costs.

The report contains an allocation of costs to the emergency-pull-cord system for ILUs for 1998.[5]  The cost was determined by developing an average hourly rate for front desk staff monitoring the system, multiplying this by the number of hours in a year (because the system was monitored 24 hours a day), and then adding an overhead cost factor of 30 percent of the staff cost. On the basis of an average hourly rate of $7.75, the total cost to monitor the emergency-pull-cord system for ILUs was determined to be $88,257.[6]  Mr. Dalton calculated this allocation.

The report contains revenue totals for 1997 and 1998 for monthly services fees from ILU residents.  For 1997, the total monthly service fees from ILU residents are listed as $7,979,906. For 1998, the report lists total monthly service fee revenue of

---

[5]The report does not contain a cost allocation to monitor the system for ILUs for 1997.

[6]The following represents the calculations contained in the report:

| | |
|---|---|
| Hours required (365 days x 24 hours) | 8,760 |
| Average hourly rate | 7.75 |
| Total staff cost | $67,890 |
| Overhead of 30 percent | 20,367 |
| Total cost to monitor | $88,257 |

$8,327,083.  The report also shows average census figures for the ILUs for 1997 and 1998.  The schedule reflects that for 1997 there were 372 occupied ILUs containing 574 residents.  For 1998, there were 386 occupied ILUs containing 591 residents.

B.    Mr. Dalton's Calculations

On behalf of AFVW, Mr. Dalton calculated the deductible portion of the monthly service fees paid in 1997 and 1998 for AFVW residents living in ILUs.  Mr. Dalton informed ILU residents of his calculations and advised them to consult their tax adviser for possible application on their tax returns.  The general approach utilized by Mr. Dalton was to use costs associated with the SNF in determining the medical expense attributable to ILU residents.  Some of the figures used by Mr. Dalton to calculate the allocation percentage are different from those outlined in the Health Facility Information report.

1.    Calculation of 1997 Medical Expenses

For 1997, Mr. Dalton used a percentage method to determine the proper allocation of monthly service fees to medical care.  Mr. Dalton calculated the allocation percentage by determining the total expenses associated with the SNF and subtracting from this figure depreciation, interest expense, and Medicare and HMO insurance reimbursements allocable to the SNF.[7] He then divided

---

[7]Mr. Dalton did not allocate any medical costs for the emergency-pull-cord system for 1997 or 1998.

this amount by the total costs, excluding total depreciation and interest expense, of Village West. Mr. Dalton calculated that 17.78 percent of the total monthly service fees paid by residents living in ILUs were allocable to medical care. Applying slightly different residency and monthly service fee figures than those contained in the Health Facility Information report, Mr. Dalton concluded that the portion of monthly service fees for ILU residents that was allocable to medical care was $374 per residence per month.

### 2. Calculation of 1998 Medical Expenses

In 1998, AFVW switched to an actuarial method to determine the deductible portion of monthly service fees.[8] However, Mr. Dalton still prepared a calculation for that year using the percentage method so that AFVW residents joining the community prior to January 1, 1998, would have information comparable to prior years for tax return preparation. Using the same methodology as in 1997, Mr. Dalton calculated that 19.01 percent of the total monthly service fees paid by residents living in ILUs were allocable to medical care. Applying slightly different residency and monthly service fee figures than those contained in the Health Facility Information report, Mr. Dalton concluded that

---

[8]The evidence in the record does not contain calculations by AFVW or Mr. Dalton using the actuarial method to determine the deductible portion of monthly service fees paid in 1998.

the portion of monthly service fee for ILU residents that was allocable to medical care was $416 per residence per month.

C.   Ad Hoc Committee's Calculation of Medical Expenses

In 1997, the resident council of Village West established an ad hoc committee (hereinafter sometimes referred to as the committee) to recalculate what portion of the monthly service fees paid by residents living in ILUs should be allocated to medical care.  The ad hoc committee reported to the resident council.  Petitioner was a participant of the ad hoc committee. In February 1998, Mr. Dalton supplied the resident council with information for purposes of determining the appropriate medical deductions for ILU residents for 1997 and 1998.[9]

In a letter dated March 13, 2000, the ad hoc committee reported to the resident council its findings regarding income tax deductions for ILU residents for health care expenses.  Using the percentage method, the committee calculated that the portions of monthly services fees allocable to medical care were 40.3 percent and 41.6 percent for the years 1997 and 1998, respectively.  In calculating total operating expenses, the committee subtracted interest expense, depreciation and amortization, issue cost, and noncontract patient expenses from total AFVW expenses. In calculating medical expenses, the

---

[9]The information supplied included the 1998 financial document that should have been included in the Health Facility Information report.

committee included SNF, ALU, and SCU operating expenses, and subtracted out noncontract patient fees and depreciation and amortization allocable to the three facilities.  The committee then made certain upward adjustments to account for the emergency-pull-cord system, food service, environmental service, utilities, and insurance.  The adjustments for food service and environmental expenses were based on formulas provided by the food service contractor and the environmental service contractor. The adjustment for utilities was based on a square-footage method and the adjustment for the insurance was based on a ratio- and square-footage methodology.

The following chart prepared by the ad hoc committee represents its calculations for 1997:

| Operating Expenses | Amount |
|---|---|
| Total expenses | $16,069,104 |
| Interest expense | (4,797,339) |
| Depreciation and amortization | (2,161,331) |
| Issue cost | (98,395) |
| Noncontract patient expense | (1,291,543) |
| Total operating expenses | 7,720,496 |

| Medical Expenses | Amount |
|---|---|
| SNF operating expenses | $3,044,041 |
| ALU and SCU operating expenses | 929,275 |
| Emergency pull-cord system | 87,374 |
| Food service adjustment | 482,769 |
| Environmental service adjustment | 112,617 |
| Utilities adjustment | 81,146 |
| Insurance adjustment | 18,234 |
| SNF noncontract patient fees | (1,207,747) |
| SNF depreciation and amortization | (211,343) |
| ALU noncontract patient fees | (80,156) |
| SCU noncontract patient fees | (3,640) |
| ALU and SCU depreciation and amortization | (140,895) |
| Allocable medical expenses | 3,111,675 |

Dividing medical expenses by total operating expenses, the committee calculated that the allocation percentage for 1997 was 40.3 percent.[10]

---

[10] 3,111,675 ÷ 7,720,496 = .403 or 40.3 percent.

The following chart prepared by the ad hoc committee

represents its calculations for 1998:

| Operating Expenses | Amount |
|---|---|
| Total expenses | $16,986,770 |
| Interest expense | (4,704,320) |
| Depreciation and amortization | (2,338,558) |
| Issue cost | (107,134) |
| Noncontract patient expense | (1,515,667) |
| Total operating expenses | 8,321,091 |

| Allocable Medical Expenses | Amount |
|---|---|
| SNF operating expenses | $3,330,031 |
| ALU and SCU operating expenses | 1,780,639 |
| Emergency pull-cord system | 88,257 |
| Utilities adjustment | 103,641 |
| SNF noncontract patient fees | (1,301,382) |
| SNF depreciation and amortization | (166,303) |
| ALU noncontract patient fees | (104,083) |
| SCU noncontract patient fees | (110,202) |
| ALU and SCU depreciation and amortization | (161,071) |
| Allocable medical expenses | 3,459,527 |

The operating expenses figures used by the committee were taken

from the 1998 financial document that should have been included

in the Health Facility Information report, not from the figures

actually contained in the report.  Dividing medical expenses by

total operating expenses, the committee calculated that the

allocation percentage for 1998 was 41.6 percent.[11]

In a memorandum dated March 15, 2000, the resident council

reported to AFVW residents a summary of the ad hoc committee's

findings.  Attached to the memorandum was a chart showing that

---

[11]3,459,527 ÷ 8,321,091 = .416 or 41.6 percent.

the annual deduction could be calculated by dividing total monthly service fees for the year by 12 months to arrive at the total average monthly service fees paid by ILU residents per month. This amount is then divided by the number of ILU residents shown in the census chart, resulting in the average monthly service fee per resident. Multiplying the average monthly service fee by the allocation percentage provides the medical deduction per resident per month. The chart contained the following information relevant to monthly service fees for ILU residents for 1997 and 1998:

|  | Independent Living Units | | |
| Year | Number Occupied | Residents | Total Yearly Service Fee |
| 1997 | 372 | 574 | $7,979,906 |
| 1998 | 386 | 591 | 8,329,241 |

In a memorandum to AFVW residents dated February 1, 2002, the resident council, in conjunction with AFVW management, provided information to residents regarding income tax deductions for health care expenses. The memorandum states that management changed from the percentage method to the actuarial method in 1998 to determine the allowable deduction, and that management planned to continue to use the actuarial method for new residents. It is noted that the actuarial method will produce a different deduction than the percentage method, and individual residents are advised to analyze each method and select the one most beneficial for his or her tax situation.

The memorandum further states that for the years 1997, 1998, and 1999, the ad hoc committee had coordinated and worked with AFVW management to review and make recommendations regarding the portion of monthly service fees allocable to medical care. In addition, the memorandum states that certified data from the financial records of AFVW for these years was provided to the ad hoc committee and that data was used to determine the appropriate allocation percentage. The allocation percentage is listed as 40.3 percent and 41.6 percent for the years 1997 and 1998, respectively. The memorandum then states that the portion of the monthly service fees allocable to medical care is determined per resident. AFVW residents were advised to consult their tax adviser for possible application of the information contained in the memorandum, and it is stated that neither AFVW nor the resident council is a tax adviser. The memorandum is signed by the chairman of the resident council and the president/CEO of AFVW.

III. Petitioners' Tax Returns

On their jointly filed 1997 and 1998 Forms 1040, U.S. Individual Income Tax Return, petitioners reported medical and dental expenses of $12,743 and $16,828, respectively.[12] Of these amounts, $6,557 and $9,891 for the years 1997 and 1998,

[12]The amounts stated in this paragraph are before application of the 7.5-percent floor contained in sec. 213(a).

respectively, related to the portion of the monthly services fees paid allocable to medical care. These amounts are primarily derived from the ad hoc committee's calculations. The amounts of $3,461 and $3,596 for the years 1997 and 1998, respectively, related to Mr. Baker's use of the pool, spa, and exercise facilities at Village West. The remainder of the reported amounts was for various other items.

Petitioners' claimed entitlement to deductions for Mr. Baker's use of the pool, spa, and exercise facilities is based in part on a letter dated July 29, 1991, from Elaine K. Jones, M.D., which states that her evaluation confirms Mr. Baker's previous diagnoses of hypertension, valvular heart disease, hyperlipidemia, and degenerative arthritis. The letter states that to treat the above medical conditions it is imperative that Mr. Baker continue his exercise program, including the exercise room, swimming pool, and whirlpool at least three times a week. The letter also states that the exercise program will help alleviate the symptoms of Mr. Baker's chronic illnesses.

IV. Respondent's Determination

The examination in this case commenced after July 22, 1998. On September 28, 2001, respondent issued a notice of deficiency to petitioners for their 1997 and 1998 taxable years. In the notice, respondent determined that the portion of the monthly service fees attributable to medical care was limited to $4,488

and $5,142 for the years 1997 and 1998, respectively.[13] Respondent's determination for 1997 was based on Mr. Dalton's determination that $374 of the monthly service fees per residence in an ILU was allocable to medical care.[14] The determination for 1998 was calculated by multiplying the 19.01-percent allocation figure determined by Mr. Dalton by petitioners' total monthly service fees paid to AFVW.[15] These determinations are based on the percentage method, not the actuarial method.[16] Respondent completely disallowed petitioners' claimed deductions for both years relating to Mr. Baker's use of the pool, spa, and exercise facilities at Village West. The remaining claimed medical deductions were allowed.

Respondent subsequently sought the advice of Alwyn V. Powell (Mr. Powell), an actuary, for the purpose of determining the portion of the monthly services fees allocable to medical care. On the basis of Mr. Powell's expert report, respondent now asserts that $4,584 and $5,304 are the correct amounts allocable

---

[13]The amounts stated in this paragraph are before application of the 7.5-percent floor contained in sec. 213(a).

[14]$374 x 12 months = $4,488.

[15]($2,254 x 12 months) x 19.01 percent = $5,142.

[16]Respondent's determinations based on the percentage method are inconsistent because for 1997 he determined the amount allocable to medical care based on the weighted average of monthly service fees paid by ILU residents but for 1998 he determined the amount allocable based on the actual monthly service fees paid by petitioners.

to medical care for petitioners for the years 1997 and 1998, respectively. In his report, Mr. Powell calculated the amounts allocable to medical care for petitioners using the actuarial method, an alternative actuarial method,[17] and the percentage method. Mr. Powell relied on the financial information contained in the Health Facility Information report for purposes of applying the above three methods.

Respondent's current position is that the actuarial method is the correct way to calculate the deductible portion of petitioners' monthly service fees. In the event that the percentage method must be used, respondent generally argues that the percentage method calculations performed by Mr. Powell are the correct calculations to use.[18]

## OPINION

During the years in issue, petitioners lived in an ILU, which, as stated above, is a residential unit designed for normal, everyday independent living of AFVW residents, and resembles a regular residential accommodation that can be found in any nonretirement living community. The primary issue in this case is the amount of the monthly service fees paid while

---

[17]On brief, respondent expressly states that use of the alternative actuarial method is not being advocated in this case.

[18]Respondent does not argue that we should use any of the figures used by Mr. Dalton in his calculations under the percentage method, which figures were the basis of the determination in the notice of deficiency.

petitioners resided in an ILU that is allocable to medical care.[19]  Resolution of this issue depends in part on whether we apply the percentage method or the actuarial method. Additionally, we must decide whether petitioners are entitled to medical deductions for amounts they claim are attributable to Mr. Baker's use of the pool, spa, and exercise facilities at AFVW.

Section 213(a) allows as a deduction any expenses that are paid during the taxable year for the medical care of the taxpayer, his spouse, and dependents and that are not compensated for by insurance or otherwise.  Estate of Smith v. Commissioner, 79 T.C. 313, 318 (1982).  The deduction is allowed only to the extent the amount exceeds 7.5 percent of adjusted gross income. Sec. 213(a); sec. 1.213-1(a)(3), Income Tax Regs.  The term "medical care" includes amounts paid "for the diagnosis, cure, mitigation, treatment or prevention of disease, or for the purpose of affecting any structure or function of the body". Sec. 213(d)(1)(A); Estate of Smith v. Commissioner, supra at 318-319.

---

[19]The portion of fees paid by residents in higher levels of care, such as ALUs, SCUs, or the SNF, that is allocable to medical care is not at issue in this case.  For further discussion of the treatment of costs incurred while residing in a retirement home, see Levine v. Commissioner, 695 F.2d 57, 59-60 (2d Cir. 1982), affg. T.C. Memo. 1981-437, Estate of Smith v. Commissioner, 79 T.C. 313, 319 (1982), and sec. 1.213-1(e)(1)(v), Income Tax Regs.

Petitioners claim that they are entitled to a medical deduction related to the monthly service fees paid using the percentage method and applying an allocation percentage of approximately 41 percent. Petitioners also claim that they are entitled to additional medical deductions as a result of Mr. Baker's use of the pool and spa facilities at AFVW.

Respondent agrees that petitioners are entitled to deduct under section 213 a portion of the monthly service fees paid to AFVW. However, respondent argues that the actuarial method should be used to calculate the amount allocable to medical care. Respondent contends that petitioners are not entitled to any deductions for Mr. Baker's use of the pool, spa, and exercise facilities at Village West because petitioners have not substantiated how the claimed amounts were calculated or that the expenditures were paid for the primary purpose of and are directly related to the medical care of the taxpayers.

I.   The Allocation Methods

The primary disagreement between the parties with respect to the monthly service fees issue is the appropriate method to use to calculate the portion of the fees allocable to medical care. Petitioners, relying on published guidance by the Commissioner, argue that they are entitled to use the percentage method. Respondent, relying on the expert report of Mr. Powell, argues that the actuarial method should be used.

A.    The Percentage Method

The percentage method assumes that the medical care portion of entrance fees and monthly service fees is the same portion or percentage as the CCRC's medical expenses to total costs because the sum of the fees over the resident's lifetime is expected to cover the costs of care for residents in a CCRC.  Thus, the percentage method generally involves analyzing each expense category to determine what portion of each category's total costs is for medical purposes.  In his report, Mr. Powell explained that this allocation process is fairly straightforward for CCRCs that provide medical care through stand alone detached units with budgets separate from the nonmedical center or that purchase medical services from a third party.  However, most CCRCs that Mr. Powell was familiar with (including Village West) do not make this distinction in their budgets and operate on a blended basis for the entire facility.

Under the percentage method, once total medical expenses are determined, this amount is divided by the CCRC's costs to determine the medical expense allocation percentage.  This percentage is then multiplied by the total monthly fees collected from ILU residents for the year to find the total medical costs allocable to monthly fees revenue.  This total is then divided by the number of ILU residents to determine the portion of the fees that is allocable to medical care.

B.    The Actuarial Method

According to respondent's expert, Mr. Powell,[20] the actuarial method is a procedure based on actuarial projections of longevity and health care utilization for estimating the deductible portion of fees paid by a taxpayer to a CCRC.  Like the percentage method, the actuarial method initially requires that expenses be allocated between medical care and nonmedical care.  The following is a simplified description of the actuarial method used by Mr. Powell and relied on by respondent.  On brief, respondent acknowledges that this description does not detail much of the complexity in actually applying the method.

The first step in applying the actuarial method is to determine operating expenses and capital expenses for the use of fixed assets.  The second step is to estimate the length of time a resident will spend in each level of care.  Although this is normally accomplished using actuarial tables, CCRCs present a complicating factor because survivorship possibilities and the corresponding life expectancies need to be refined by the level of care (e.g., independent living versus assisted living versus skilled nursing care).  The third step is to combine the

--------

[20]Mr. Powell is the chairman and CEO of A.V. Powell & Associates, LLC, a firm of consulting actuaries and accountants. Mr. Powell has an undergraduate degree in major statistics from Harvard and a master's degree in actuarial science from Georgia State University.  Mr. Powell was recognized by the Court as an expert in actuarial science.

assumptions about costs of services with the longevity projection to determine the lifetime total costs of care and the lifetime total medical care costs. By applying the lifetime medical care costs, the fourth step uses the contract provision about monthly service fees paid to determine the prepaid medical care costs.

The amount of medical care that is funded before transfer to assisted living or nursing care is the difference between lifetime medical care costs and the sum of monthly service fees paid. This difference is referred to as the prepaid medical care costs and should be considered deductible under section 213(a). The calculation of the portion of the prepaid medical care costs that can be claimed for the entrance fee and the portion that can be claimed for the total monthly service fees for the year is at the discretion of the taxpayer with the limitation that the actuarial present value sum of all deductions does not exceed the prepaid medical care costs.

C. Appropriate Allocation Method

The threshold dispute is over which method to use to determine the portion of the monthly service fees that is allocable to medical care. As explained in detail below, the percentage method preferred by petitioners has been accepted by respondent and generally relied upon since at least 1967. Properly applied, the percentage method provides a reasonable and straightforward approach for determining the portion of monthly

service fees that is allocable to medical care.  The method

provides a direct link between the actual fees paid by the

residents and the medical costs incurred by the CCRC during the

taxable year.  Despite this, respondent asserts that the

actuarial method is more precise and accurate.  Respondent freely

admits that the actuarial method is more complex, indeed, so

complex as to defy full explanation in testimony and on brief.

Both methods involve subjective judgments, so neither is immune

from differences of opinion.  We hold under these circumstances

that petitioners are not compelled to adopt a new method, and we

decline respondent's suggestion that the percentage method be

usurped by the actuarial method.

As noted above, use of the percentage method has been

sanctioned by respondent for over 35 years.  In Rev. Rul. 67-185,

1967-1 C.B. 70, Rev. Rul. 75-302, 1975-2 C.B. 86, and Rev. Rul.

76-481, 1976-2 C.B. 82,[21] the Commissioner addressed similar

situations involving the issue of whether the portion of a

monthly fee paid by individuals in connection with their

---

[21]We are aware that revenue rulings are not binding on this
Court or other Federal courts. Rauenhorst v. Commissioner, 119
T.C. 157, 171 (2002); Frazier v. Commissioner, 111 T.C. 243, 248
(1998).  However, the public has a right to rely on positions
taken by the Commissioner in published guidance. Alumax, Inc. v.
Commissioner, 109 T.C. 133, 163 n.12 (1997), affd. 165 F.3d 822
(11th Cir. 1999); Am. Campaign Acad. v. Commissioner, 92 T.C.
1053, 1070 (1989); Nissho Iwai Am. Corp. v. Commissioner, 89 T.C.
765, 778 (1987); see also Rev. Proc. 89-14, sec. 7.01(5), 1989-1
C.B. 814 (taxpayers may rely on published revenue rulings in
determining the tax treatment of their own transactions).

residence at a retirement home under a lifetime care contract was deductible by the individuals as an expense for medical care under section 213, subject to the limitations of the statute.  In the rulings, the taxpayers had entered into agreements with a retirement home under which they became entitled to live in the home and to receive lifetime care that included specified residential accommodations, meals, and medical care.  In exchange for the promise of the lifetime care, the taxpayers paid a monthly fee to the homes.

In Rev. Rul. 67-185, supra at 70, the taxpayers proved that on the basis of the retirement home's experience, a portion of the monthly fee was for costs of providing medical care, medicine, and hospitalization.  The ruling cited the holding in Rev. Rul. 54-457, 1954-2 C.B. 100, that where a university charges a student a lump-sum fee which includes his education, board, medical care, etc., the portion of the charge which was allocable to medical care is considered a proper medical expenses deduction if there is a breakdown showing the amount of the fee allocable to medical care, or such information was readily available to the university.  Id. at 71.  Rev. Rul. 67-185, supra, then stated that the principle in Rev. Rev. 54-457, supra, relating to allocation of the fee, was equally applicable to its situation.  Rev. Rul. 67-185, supra at 71, concluded:

Accordingly, where the taxpayers, a husband and his wife, pay a monthly life-care fee to a retirement home, and prove that a specific portion of the fee covers the costs of providing medical care for them, that portion of the fee is deductible by the taxpayers as an expense for medical care in the year paid, subject to the limitations prescribed in section 213 of the Code.[22]

In Rev. Rul. 75-302, supra, the taxpayer, pursuant to a lifetime care contract with a retirement home, was required to pay a lump-sum fee.  The Commissioner ruled that the portion of the lump-sum fee that was properly allocable to the taxpayer's medical care was deductible as an expense for medical care in the year paid, subject to the limitations in section 213.

The facts involved in Rev. Rul. 76-481, supra, are similar to those in Rev. Rul. 67-185, supra.  Rev. Rul. 76-481, supra at 82, noted that the fees were calculated without reference to any similar contract with other patients at the institution and was not medical insurance.  Additionally, because the home had not been in operation for a sufficient length of time to demonstrate from its own financial experience what portion of the fees was allocable to medical care of the residents, the home used long-term financial information from a comparable retirement home. Id. at 83.  The home determined that 15 percent of the monthly fee would be used to discharge the home's obligations to provide medical care to its residents.  Id.

---

[22]See also Rev. Rul. 68-525, 1968-2 C.B. 112 (relying on the statement in Rev. Rul. 67-185, 1967-1 C.B. 70).

The ruling first examined previous rulings discussing the deductible portion of fees paid by taxpayers for lifetime care from retirement homes. <u>Id.</u> The ruling cited the statement in Rev. Rul. 67-185, <u>supra</u>, quoted above. The ruling then addressed the monthly fee issue and stated:

> In addition, the portion of the monthly fee (15 percent * * *) paid by the taxpayers that is properly allocable to medical care is also deductible as an expense for medical care in the year paid, subject to the limitations prescribed in section 213 of the Code. [<u>Id.</u>]

The ruling also discussed the deductibility of portions of an entrance fee paid by the taxpayers.[23]  <u>Id.</u>

---

[23]In other rulings, taxpayers have been allowed to deduct specific portions of entrance fees paid to retirement homes, subject to the limitations of sec. 213.  See Rev. Rul. 76-481, 1976-2 C.B. 82 (10 percent of entrance fee allocable to medical care); Rev. Rul. 75-302, 1975-2 C.B. 86 (30 percent of entrance fee allocable to medical care).  In <u>Estate of Smith v. Commissioner</u>, 79 T.C. 313, 321-322 (1982), we held that 7 percent of an entrance fee paid to a retirement home was allocable to medical care because this percentage was determined to be the cost of providing free days of standard care in a convalescent center for the residents' lifetimes.  The Commissioner acquiesced in our decision in <u>Estate of Smith</u> at 1984-2 C.B. 1.

None of the above rulings have been revoked or modified,[24] and the Commissioner has relied on these rulings in issuing private letter rulings regarding the deductible portion of monthly service fees.[25]  Indeed, the Commissioner in private letter rulings has cited the above revenue rulings and sanctioned use of the percentage method.  See, e.g., Priv. Ltr. Rul. 86-30-005 (Apr. 4, 1986), which states in relevant part:

> The proper allocation of medical to total fees may be determined by dividing all directly related medical expenses by total expenses.  To the extent that they can be substantiated and are allocable to medical care facilities, medically related expenses may include,

---

[24]Although Rev. Rul. 76-481, supra, was clarified by Rev. Rul. 93-72, 1993-2 C.B. 77, the clarification does not affect the issue in the instant case.  It is unclear whether the Commissioner has considered the issue of the deductibility of monthly service fees since 1993.  See Rev. Proc. 93-43, 1993-2 C.B. 544 (stating that no further rulings will be issued on the issue of whether amounts paid for medical care extending substantially beyond the taxable year may be deducted under section 213); see also Rev. Proc. 99-3, 1999-1 C.B. 103 (designating the issue stated in Rev. Proc. 93-43, supra as an area under extensive study in which rulings or determination letters will not be issued until the Service resolves the issue through publication of a revenue ruling, revenue procedure, regulations, or otherwise).  We note that the monthly service fees in this case relate to current medical care.

[25]See, e.g., Priv. Ltr. Rul. 86-51-028 (Sept. 19, 1986); Priv. Ltr. Rul. 86-41-037 (July 11, 1986); Priv. Ltr. Rul. 86-30-005 (Apr. 4, 1986); Priv. Ltr. Rul. 82-13-102 (Dec. 30, 1981). Private letter rulings are not regarded as precedent in this Court and may not be relied on by the public.  Sec. 6110(j)(3); Alumax, Inc. v. Commissioner, 109 T.C. at 163 n.12.  However, private letter rulings may be cited to show the practice of the Commissioner.  Rowan Cos., Inc. v. United States, 452 U.S. 247, 261 n.17 (1981); Hanover Bank v. Commissioner, 369 U.S. 672, 686-687 (1962); Rauenhorst v. Commissioner, 119 T.C. at 170 n.8; Estate of Cristofani v. Commissioner, 97 T.C. 74, 84 n.5 (1991).

among other items, salaries of nurses, nurses' aides, orderlies and incidental medication and supplies, as well as expenses allocable to the facility, such as, housekeeping, maintenance and utilities, a proportionate share of interest on indebtedness, real estate taxes, insurance, and depreciation.

\* \* \* \* \* \* \*

(5) Medical expenses for purposes of the computation of the ratio of medical to total expenses include, but are not limited to, salaries of the Medical Center staff, incidental medication and supplies, the proportionate amount attributable to the provision of medical care of housekeeping, maintenance, utilities, administrative and marketing costs, interest on indebtedness, real estate taxes and depreciation of the nursing facility.

There is no requirement in the revenue rulings that taxpayers engage in an actuarial analysis to factor in life expectancy and health care level expectancy on the basis of the residency population of a CCRC to determine estimated lifetime medical care costs and total costs. The rulings focus on the amount of fees paid by residents to the CCRC during the taxable year that are properly allocable to medical care in the year paid, and imply that the percentage method is an appropriate method for taxpayers to use. The actuarial method used by respondent's expert requires estimating total lifetime costs of services and lifetime medical care costs, steps that are not anticipated or required by the revenue rulings. Additionally, the longstanding practice of the Commissioner has been to allow use of the percentage method. The Commissioner's guidance

provides further justification for our holding that petitioners
are not required to use the actuarial method.

## II.  Burden of Proof

We must now determine which party bears the burden of proof
as to the factual issues in this case.  Generally, the taxpayer
bears the burden of establishing the entitlement to any deduction
claimed.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992);
New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).
However, in certain circumstances, if the taxpayer introduces
credible evidence with respect to any factual issue relevant to
ascertaining the proper tax liability, section 7491 places the
burden of proof on the Commissioner.  Sec. 7491(a)(1).  Credible
evidence is "'the quality of evidence which, after critical
analysis, the court would find sufficient upon which to base a
decision on the issue if no contrary evidence were submitted'".
Higbee v. Commissioner, 116 T.C. 438, 442 (2001) (quoting H.
Conf. Rept. 105-599, at 240 (1998), 1998-3 C.B. 755, 994).
Section 7491(a)(1) applies only if an individual taxpayer
complies with substantiation requirements, maintains all required
records, and cooperates with reasonable requests by the
Commissioner for witnesses, information, documents, meetings, and
interviews.  Sec. 7491(a)(2).[26]

---

[26]Sec. 7491 is effective with respect to court proceedings
arising in connection with examinations commencing after July 22,
(continued...)

Whether an expense is for medical care is primarily a question of fact. Levine v. Commissioner, 695 F.2d 57, 59 (2d Cir. 1982), affg. T.C. Memo. 1981-437; Counts v. Commissioner, 42 T.C. 755, 764 (1964); Estate of Smith v. Commissioner, 79 T.C. at 319; sec. 1.213-1(e)(1)(v), Income Tax Regs. For purposes of this case, the factual issues involved are: (1) The portions of the monthly service fees allocable to medical care under the percentage method; and (2) the amounts, if any, that petitioners are entitled to deduct for Mr. Baker's use of the pool, spa, and exercise facilities.

On brief, respondent argues that petitioners have failed to present credible evidence that they are entitled to the amounts of the medical deductions claimed on their returns for the years in issue and that they did not comply with the substantiation, recordkeeping, and cooperation requirements of section 7491(a)(2). However, at trial, respondent specifically stated that petitioners had cooperated and maintained records. Respondent represented to the Court that the only issue under section 7491(a) was whether petitioners had presented credible evidence. We treat respondent's representation at trial as a

---

[26](...continued)
1998. Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727. Respondent has conceded that the examination in this case commenced after July 22, 1998.

concession that petitioners have satisfied the requirements of section 7491(a)(2).

The stipulated joint exhibits and petitioners' exhibits contain detailed financial information, including total revenue and expenses figures for Village West for the years in issue. Petitioners rely primarily on the findings of the ad hoc committee, of which Mr. Baker was a member, with certain adjustments. AFVW management informed its AFVW residents that certified data from the financial records of AFVW for the years in issue was provided to the ad hoc committee and that the committee coordinated and worked with management to review and make recommendations regarding the allowable deductions for medical expense. This financial information and the ad hoc committee's report are detailed and contain the revenue and expense figures necessary to calculate petitioners' medical deductions for the years in issue. After discussing this issue with the parties at trial and examining their briefs, we interpret petitioners' position to be that both the ad hoc committee's findings and the findings resulting from petitioners' subsequent adjustments are appropriate methods of calculating the appropriate allocation percentage and determining petitioners' medical deductions.

After thorough review and critical analysis of the stipulated joint exhibits and petitioners' exhibits, we find that

petitioners have submitted credible evidence; i.e., evidence which, after critical analysis, is sufficient on which to base a decision sustaining the ad hoc committee's calculations regarding the portion of the monthly service fees that is allocable to medical care under the percentage method.[27]  Accordingly, we hold that respondent bears the burden of proof regarding the portions of the monthly service fees paid by petitioners in 1997 and 1998 that are allocable to medical care under the percentage method.[28]

However, with respect to the claimed deductions for medical use of the pool, spa, and exercise facilities, we find that petitioners have not submitted credible evidence.  The financial information discussed above, as further explained below, does not contain specific figures or calculations by Mr. Dalton or AFVW relating to expenditures for the facilities that are sufficient

---

[27]See Forste v. Commissioner, T.C. Memo. 2003-103 (holding that taxpayers produced credible evidence in the form of draft proposal offers and final settlement agreement that was sufficient to show that a payment was made in settlement of tort or tort-type claim for personal injury).

[28]On brief, petitioners argue that respondent's reliance on Mr. Powell's report and use of the actuarial method constitutes a new matter.  Petitioners may be correct, especially in light of the fact that any appeal in this case would normally lie to the Court of Appeals for the Ninth Circuit.  See, e.g., Estate of Harper v. Commissioner, T.C. Memo. 2002-121 (discussing recent decisions by the Court of Appeals for the Ninth Circuit regarding burden of proof).  However, because we have already held that respondent has the burden of proof, we need not reach this issue.

for us to base our decision.  Therefore, we conclude that the

burden of proof does not shift to respondent on this issue.[29]

III. <u>Portion of Monthly Services Fees Allocable to Medical Care</u>
     <u>Under the Percentage Method</u>

The parties' positions regarding the application of the

percentage method are based primarily on the ad hoc committee's

report and the portion of Mr. Powell's report discussing this

method.  Respondent argues that Mr. Powell's application of the

method and the resulting conclusion should be followed if the

percentage method is applied.  Petitioners rely primarily on the

ad hoc committee's findings with certain adjustments contained in

a supplemental calculation.  After discussing this issue with the

parties at trial and examining their briefs, we interpret

petitioners' position to be that both the ad hoc committee's

findings and the findings resulting from petitioners' subsequent

adjustments are appropriate methods of determining the

appropriate allocation percentage.  Petitioners ultimately argue

that, based on either calculation, the appropriate allocation is

approximately 41 percent.

A.   <u>Petitioners' Calculations</u>

Petitioners generally agree with the approach and financial

figures used by the ad hoc committee, of which Mr. Baker was a

_____

[29]Petitioners do not argue that respondent raised a new
matter with respect to the disallowance of the claimed deductions
for Mr. Baker's use of the pool, spa, and exercise facilities.

member.  They also presented a supplemental report prepared by Mr. Baker as another means of establishing the appropriate allocation percentage.  As previously mentioned, we interpret their position to be that the allocation percentage is approximately 41 percent under either the ad hoc committee's calculations or Mr. Baker's supplemental report.

In order to complete its calculations regarding the appropriate allocation percentage, the ad hoc committee relied on certified data from the financial records of AFVW.  The committee coordinated and worked with AFVW's management in reaching its calculations.  Petitioners have adequately demonstrated to the Court how the ad hoc committee used the information provided by AFVW management to arrive at its conclusions regarding the appropriate allocation percentage.

The ad hoc committee calculated an allocation percentage by dividing medical expenses by total operating costs, with specific item adjustments to both figures.  In calculating total operating costs, the committee subtracted interest expense, depreciation and amortization, issue cost, and noncontract patient expenses from total costs.  In calculating medical expenses, the committee included SNF, ALU, and SCU operating expenses, and subtracted out noncontract patient fees and depreciation and amortization allocable to the three facilities.  The committee then made certain upward adjustments to account for the emergency-pull-cord

system, food service, environmental service, utilities, and insurance. The adjustments for food service and environmental expenses were based on formulas provided by the food service contractor and the environmental service contractor. The adjustment for utilities was based on a square-footage method and the adjustment for insurance was based on a ratio- and square-footage methodology.

The committee ultimately concluded that the allocation percentages were 40.3 percent and 41.6 percent for the years 1997 and 1998, respectively. The resident council reported to AFVW residents a summary of the ad hoc committee's findings. The resident council explained how the allocation percentage was to be applied, provided the same census figures used in the Health Facility Information report, and stated what the medical deduction was per resident.

Mr. Baker testified that the calculations in the supplemental report he prepared were similar to the ad hoc committee's calculations. He testified that his calculations assumed that the fee charged for a medical service approximated the cost of Village West's providing that service. Mr. Baker did not explain in detail the adjustments contained in his supplemental report, and we are unable to satisfactorily connect his figures to the financial information contained in the record. As a result, we find the supplemental report to not be helpful,

and we choose not to rely on it in our analysis. Accordingly, we will examine respondent's position to determine whether he has shown that the allocation percentages and portions of the monthly service fees allocable to medical care are different from those calculated by the ad hoc committee.

B. Mr. Powell's Calculations

Respondent relies on the percentage method as applied by Mr. Powell. Although Mr. Powell did not believe that the percentage method should be used, he developed a procedure for generating a percentage for use with the percentage method. Mr. Powell stated that the basic formula would examine the relationship between total costs and amounts allocated to medical care, with adjustments for specific items. In his report, Mr. Powell stated that because the sum of entrance fees and monthly service fees over the resident's lifetime is expected to cover the costs of care for residents in a CCRC, it is reasonable to assume that the costs of medical care in the fee structure represent the same proportion or percentage in the total costs. Mr. Powell relied on the financial figures in AFVW's Health Facility Information report. He did not rely on the 1998 financial document.

Mr. Powell stated that total costs would include departmental cash expenses plus depreciation and interest expense. Subtractions would be made for issuance costs associated with debt financing, room and board revenues and

Medicare and HMO billings for noncontract patients in the SNF, and ancillary services associated with the SNF.  He stated that it is reasonable to subtract medical expenses not associated with the residents from both the numerator and denominator of the formula.  Additionally, the ancillary fees that are paid on a fee-for-service basis and expected reimbursements from Medicare and HMO insurance should also be subtracted from both the numerator and denominator because these expenses are not expected to be covered by entrance fees or monthly service fees.

Similar to the ad hoc committee, Mr. Powell believed that the expenses for medical care would include expenses allocated to the ALU, SCU,[30] and SNF, plus a portion of the interest expense allocable to these facilities.  The same debt finance costs, SNF room and board revenues, and ancillary services and Medicare and HMO billings subtracted from the total costs would also be subtracted from the medical expense.  In addition, ancillary services, Medicare, and HMO billings for residents should be subtracted; however, Mr. Powell stated that he could not obtain an accurate amount due to a difference between the accrual and cash bases for those revenues.

---

[30]The SCU was completed in June 1997 and began operation at that time.  Mr. Powell did not allocate any medical expenses to the SCU for 1997.

The following chart prepared by Mr. Powell reflects his calculations for 1997:

| Operating Expenses | Source for Amount |
|---|---|
| $16,069,104 | Total operating expenses for AFVW, including depreciation and interest expense |
| (93,395) | Issuance costs associated with debt financing |
| (1,207,747) | SNF room and board revenues for noncontract patients |
| (448,462) | SNF ancillary services, Medicare, and HMO billings for noncontract patients |
| 14,319,500 | Total for denominator |

| Medical Expenses | Source for Amount |
|---|---|
| $3,044,014 | Operating expenses allocated to SNF |
| 929,275 | Operating expenses allocated to ALU |
| 479,734 | 10 percent of interest expenses to SNF |
| 319,823 | 6.67 percent of interest expenses to ALU |
| (1,207,747) | SNF room and board revenues for noncontract patients |
| (448,462) | SNF ancillary services, Medicare, and HMO billings for noncontract patients |
| (0) | Ancillary services, Medicare, and HMO billings for residents; not included |
| [1]3,116,664 | Total for numerator |

For 1997, the percentage is 21.8 percent ($3,116,664 ÷ $14,319,500).[2]

[1]We note that the total of the medical expenses is $3,116,637, not $3,116,664 as listed in Mr. Powell's report.

[2]We note that application of the corrected medical expense figure still produces a percentage of 21.8 percent.

The following chart prepared by Mr. Powell reflects his calculations for 1998:

| Operating Expenses | Source for Amount |
|---|---|
| $17,759,058 | Total operating expenses for AFVW, including depreciation and interest expense |
| (107,134) | Issuance costs associated with debt financing |
| (1,315,694) | SNF room and board revenues for noncontract patients |
| (378,905) | SNF ancillary services, Medicare, and HMO billings for noncontract patients |
| 15,957,325 | Total for denominator |

| Medical Expenses | Source for Amount |
|---|---|
| $3,330,031 | Operating expenses allocated to SNF |
| 984,333 | Operating expenses allocated to ALU |
| 796,306 | Operating expenses allocated to SCU |
| 466,912 | 10 percent of interest expenses to SNF |
| 311,275 | 6.67 percent of interest expenses to ALU |
| 311,275 | 6.67 percent of interest expenses to SCU |
| (1,315,694) | SNF room and board revenues for noncontract patients |
| (378,905) | SNF ancillary services, Medicare, and HMO billings for noncontract patients |
| (0) | Ancillary services, Medicare, and HMO billings for residents; not included |
| 4,505,533 | Total for numerator |

For 1998, the percentage is 28.2 percent ($4,505,533 ÷ $15,957,325).

To complete his procedure, Mr. Powell chose to apply the percentages to the total monthly service fees that petitioners paid to Village West. As previously mentioned, petitioners' monthly service fees were $2,170 and $2,254 for 1997 and 1998, respectively. Thus, Mr. Powell calculated that petitioners were

entitled to deductions (before application of the 7.5-percent floor) of $5,677[31] and $7,628.[32]

C.    Analysis of Parties' Positions

Our approach in this case is to examine the ad hoc committee's calculations regarding the appropriate allocation percentage in light of respondent's allegations of error, which are primarily based on Mr. Powell's calculations, his testimony, and the testimony of Mr. Dalton.[33]   In order to accomplish this task, we will address the portions of the committee's calculations that respondent claims are inaccurate.  Because respondent relies on Mr. Powell's application of the percentage method, we generally compare this approach with that used by the ad hoc committee.

The ad hoc committee computed the denominator by starting with total costs and subtracting total interest expense, total depreciation and amortization, total issue cost, and total noncontract patient expense.  Mr. Powell did not subtract total interest expense and total depreciation and amortization.

---

[31]Calculated as 21.8 percent of 12 x $2,170.

[32]Calculated as 28.2 percent of 12 x $2,254.

[33]We note that to the extent respondent has not challenged certain assumptions by the ad hoc committee, we treat these as concessions by respondent and express no opinion as to the validity or accuracy of the assumptions.

However, Mr. Powell did subtract SNF ancillary services, Medicare, and HMO billings for noncontract patients.

The ad hoc committee calculated medical expenses by first calculating the sum of SNF, ALU, and SCU operating expenses, expenses related to the emergency-pull-cord system, and certain adjustments related to food service, environmental service, utilities, and insurance. It then subtracted noncontract patient fees for the SNF, ALU, and SCU, and depreciation and amortization allocable to the SNF, ALU, and SCU.[34] In addition to including operating expenses of the SNF, ALU, and SCU, Mr. Powell included interest expense allocable to the SNF and ALU. He did not include an expense for the emergency-pull-cord system or adjustments for food service, environmental service, utilities, or insurance. Mr. Powell did not subtract either noncontract patient fees for the ALU and SCU or depreciation and amortization of the SNF, ALU, and SCU. However, he did subtract SNF ancillary services, Medicare, and HMO billings for noncontract patients. The ad hoc committee and Mr. Powell used slightly different financial figures in their reports.

---

[34]In the Health Facility Information report, expenses related to depreciation are included in the medical expenses allocable to the SNF, ALU, and SCU. Allocations for amortization of debt issue cost, amortization of preopening cost, and interest expense are not included.

1.    Appropriate Financial Information To Use

The ad hoc committee and Mr. Powell both relied primarily on the financial information for 1997 and 1998 that was contained in the Health Facility Information report.  For 1998 revenues and expenses, the committee relied on the 1998 financial document that should have been included in the report.  There are minor differences between the figures presented in the 1998 financial document and the report.  Respondent has not argued that the financial information used by the ad hoc committee is inaccurate or unreliable, and Mr. Powell acknowledges in his report that the 1998 financial document was based on actual results for that year.  With respect to the explanation of expense allocation assumptions by AFVW, Mr. Powell stated that he reviewed the assumptions and relied on AFVW's management's judgment because he believed the final results were reasonable.  Accordingly, we proceed under the assumption that the financial figures and expense allocation assumptions contained in the Health Facility Information report are appropriate, with the exception that revenue and expense figures for 1998 should be based on the 1998 financial document.

2.    Interest Expense and Depreciation and Amortization

In calculating total costs, the ad hoc committee subtracted interest expenses and depreciation and amortization.  In calculating allocable medical costs, the committee also

subtracted interest expense and depreciation and amortization allocable to the SNF, ALU, and SCU.  Mr. Powell included both interest expense and depreciation and amortization in his calculations.

Mr. Powell testified that it was not technically accurate to subtract depreciation and interest expense from total costs and medical expenses.  He explained that entrance fees and monthly service fees are used to cover the total costs of AFVW, which includes capital costs.  Therefore, he felt that excluding these two items from total costs would distort the allocation percentages.  Petitioners argue that under the percentage method only operating expenses are included in the denominator of the equation.  They claim that interest should not be included because it is simply the cost of borrowing capital to fund the investment in Village West and does not represent an operating expense.  Petitioners claim that depreciation and amortization are not operating expenses because they represent the initial capital costs of investing in plant and equipment.

Under the percentage method, the medical expenses of the CCRC are calculated and then compared to all the expenses of the community to determine the appropriate percentage of expenses allocable to medical care.  In applying the percentage method in this case, both the numerator and denominator in the equation should include interest expenses and depreciation and

amortization because the evidence in the record indicates that Village West offered a nursing care arrangement where the monthly service fees for the years in issue were intended to cover all expenses related to AFVW residents. Neither the residence agreement nor the financial information submitted by the parties indicates whether the entrance fees or monthly service fees are allocated to specific costs or what that allocation is. Thus, the denominator in this case should be based on the total costs of the CCRC, which necessarily includes costs for these two items. It is also logical to include interest expense and depreciation and amortization costs related to medical facilities when other expenditures relating to the operation of those facilities (e.g., utilities, food services, health services) are included. Therefore, we assume for purposes of this case that the monthly service fees are applied equally to all expenses, including interest expense and depreciation and amortization. Accordingly, we agree with respondent and Mr. Powell that, in this case, interest expense and depreciation and amortization should be included in both the numerator and denominator.[35]

---

[35]The SCU was placed in service in June 1997 and started operation at that time. Accordingly, in calculating the interest expense allocable to the SCU for 1997 we include half the amount that would have been allocable had the facility been in operation for the entire year.

### 3.   Emergency-Pull-Cord System and Other Adjustments

The ad hoc committee made upward adjustments to the medical expense figures to account for the emergency-pull-cord system and food service, environmental service, utilities, and insurance figures that it felt were not adequately reflected in AFVW's financial records.  The committee's calculations for the emergency-pull-cord system are based on Mr. Dalton's calculation contained in the Health Facility Information report.

Respondent's general argument on this issue is that Mr. Powell's calculations should be followed.  However, Mr. Powell did not specifically discuss the emergency-pull-cord system or other adjustments either in his report or during trial. Respondent's only specific argument is contained in his reply brief wherein he states that "Although it is petitioners' contention that the pull cord was not included as a medical expense, * * * Mr. Dalton testified the pull cord system became an indirect cost."

Mr. Dalton prepared the allocation worksheet for the emergency-pull-cord system.  He testified that there is a pull-cord system in all ILUs so that in case of an emergency a resident can pull the cord connected to the front desk and Village West can provide a crisis nurse within a number of minutes.  Mr. Dalton testified that there were seven or eight persons who worked at the front desk and that although other

services were provided by front desk staff one of the main functions was to address the emergency-pull-cord system. In making the allocation, Mr. Dalton assumed that the allocable cost of front desk staff to monitor the system would be an average hourly rate for one person for 24 hours a day for 365 days a year. Mr. Dalton explained that the expenditures for the system are not set out in a specific account but are charged to a general ledger account. Specifically, he testified that the payroll and benefits for a person monitoring the system would be found under the resident services expense category, which includes certain expenses related to the staffing of the front desk.

After reviewing the financial information and the ad hoc committee's report, we find that no amount from the resident services expense account (other than the committee's allocation for the pull-cord system) was included by either Mr. Powell or the committee in their medical expense calculations. Respondent does not challenge the amount of the allocation by Mr. Dalton for medical expenses associated with the emergency-pull-cord system, and we find the calculation to be reasonable based on the evidence in the record. Because respondent has not raised any other arguments on this issue or specifically argued or presented adequate evidence that the other upward adjustments are

inappropriate, we accept the allocations to the pull-cord system and the other adjustments made by the ad hoc committee.

>4. <u>SNF Ancillary Services, Medicare, and HMO Billings, and ALU and SCU Noncontract Patient Fees</u>

In his calculations, Mr. Powell excluded from both total costs and medical costs expenses for SNF ancillary services, Medicare, and HMO billings for AFVW residents and noncontract patients, and ALU and SCU noncontract patient fees. However, Mr. Powell stated that he could not obtain an accurate amount of SNF ancillary services, Medicare, and HMO billings for AFVW residents, and therefore he did not exclude any amount in his calculations. Respondent has not specifically argued or provided any amount that we should exclude for SNF ancillary service, Medicare, and HMO billings for AFVW residents. Accordingly, we need only address the remaining items as they relate to whether expenses related to noncontract patients should be excluded from total costs and medical expenses.

Both the ad hoc committee and Mr. Powell subtracted noncontract patient fees related to the SNF from total costs and medical costs. The committee also subtracted noncontract patient fees related to the ALU and SCU. After reviewing Mr. Powell's reasoning and respondent's arguments (discussed in further detail below) with respect to expenses and reimbursements related to noncontract patients, we infer that this was an oversight on the part of Mr. Powell, and the committee's position on this issue is

not being challenged.  Accordingly, the noncontract patient fees related to the SNF, ALU, and SCU should all be excluded from total costs and medical expenses.

In his report, Mr. Powell states that it is reasonable to subtract SNF ancillary service, Medicare, and HMO billings from total costs and medical expenses.  Respondent argues that the entrance fees and monthly service fees are expected to cover the costs of care for residents of a CCRC, and therefore it is reasonable to subtract expenses not expected to be covered by the fees.  Respondent contends that ancillary services that are paid on a fee-for-service basis, and expected reimbursements from Medicare and HMO insurance are expenses not covered by the entrance fees and monthly service fees.

At trial, Mr. Dalton testified that if medical care was covered by insurance, then the fees were charged directly to the insurance company and charged to an expense account.  If payment was received from Medicare or an HMO insurance company, the payments were credited to a revenue account.

We agree with respondent on this issue.  Our understanding of the facts of this case is that the monthly service fees are paid to cover costs related to AFVW residents.  The ad hoc committee allocated SNF, ALU, and SCU expenses to medical care; however, these facilities are also used by noncontract patients. The noncontract patients are charged fees for use of the

facilities, and petitioner has not disputed that noncontract patients also pay for certain services on a fee-for-service basis. Additionally, AFVW can receive reimbursement from Medicare and HMO insurance for care given to noncontract patients. These fee-for-service and reimbursement proceeds are included as revenue in AFVW's books. Although these proceeds are not used specifically to offset expenses in the noncontract patient expense accounts, the revenue relates to care given to noncontract patients in the SNF, ALU, and SCU, and we believe that the expenses of these facilities should be reduced to accurately reflect the portion of the monthly service fees paid for care of AFVW residents. In substance, this treatment is consistent with the subtraction of SNF, ALU, and SCU noncontract patient fees from total costs and medical expenses. We have reviewed the figures used by Mr. Powell and find them consistent with AFVW's financial information and acceptable for purposes of this calculation.[36]

D.  The Court's Application of the Percentage Method

Mr. Dalton and the ad hoc committee applied the allocation percentage to a weighted average of monthly service fees paid by

---

[36]We are unable to derive the amount for 1998 for SNF ancillary services, Medicare, and HMO billings for noncontract patients from the 1998 financial document that should have been included in the Health Facility Information report. Therefore, like Mr. Powell, we rely on the 1998 information contained in the report.

occupants of ILUs.  Mr. Dalton's calculations provide a deduction

per residence while the ad hoc committee's calculations are per

resident.  Mr. Powell applied the percentage based on the actual

monthly service fees paid by petitioners and calculated an

allocable amount per residence.[37]  Although respondent states

that Mr. Powell's application of the percentage methodology is

correct, respondent argues that a weighted average should be used

because it provides some consistency among ILU residents and is

fair and objective.  Petitioners argue that the allocation

percentages should be applied to the actual fees they paid.

We believe that the more appropriate application of the

percentage method is to allocate to each resident the same amount

for purposes of determining the appropriate medical deduction

related to the payment of monthly service fees.  If we accepted

petitioners' approach, single residents and residents of double-

occupancy ILUs that are larger than the average ILU (and thus pay

higher monthly service fees) would get a larger medical expense

deduction based solely on the number of occupants of the ILU or

the square footage of the unit.  We fail to see the relationship

between the health care expenses of residents and the size and

---

[37]This application of the percentage method appears at odds
with a statement in the section of Mr. Powell's report providing
an overview and criteria for the evaluation of the different
methods.  In his report, Mr. Powell states that similar residents
have the same expected health care usage and thus should receive
the same deduction regardless of the size of their accommodations
or the fees they pay.

cost of their ILUs.  Accordingly, we hold that the allocation percentage must be applied based on the number of residents and the average weighted monthly service fees (or weighted annual service fees in the case of residents living in ILUs for the entire year).

On the basis of the undisputed assumptions by AFVW and our findings above, we have calculated the amounts allocable to ILU residents of Village West for medical care related to their monthly service fees.  Our calculations show that the amounts of $7,766 and $8,476 paid by petitioners as service fees for 1997 and 1998, respectively, were for medical care.  The details of our calculations are contained in the attached appendix.

IV.  Deductions for Use of Pool, Spa, and Exercise Facilities

Petitioners claim that they are entitled to deductions for Mr. Baker's use of the pool, spa, and exercise facilities because:  (1) The use of the facilities was necessary to alleviate his chronic illnesses; and (2) a portion of the monthly service fees is properly allocable to the operation and maintenance of these facilities.  Respondent argues that no deductions are allowable because Mr. Baker's use of the facilities was personal in nature, any expense related to use of the facilities would otherwise have been incurred by AFVW residents, and the methodology used by petitioners to allocate a portion of the monthly service fees to the operation and

maintenance of the facilities is flawed and should be disregarded.

Deductions for expenditures for medical care are confined strictly to expenses incurred primarily for the prevention or alleviation of a physical or mental defect or illness. Haines v. Commissioner, 71 T.C. 644, 647 (1979); sec. 1.213-1(e)(1)(ii), Income Tax Regs. An expenditure which is merely beneficial to the general health of an individual, such as an expenditure for a vacation, is not an expenditure for medical care. Sec. 1.213-1(e)(3)(ii), Income Tax Regs. An important condition that must be satisfied for the claim to succeed is whether the expenditure would have been made even if there had been no illness. Jacobs v. Commissioner, 62 T.C. 813, 819 (1974); Lepson v. Commissioner, T.C. Memo. 1982-304.

Petitioners introduced a calculation by Mr. Baker for allocating a portion of the monthly service fees to the cost of providing the facilities. Mr. Baker applied varying allocation percentages to gross expense figures from eight different expense categories to arrive at a total allocation amount. He then divided this amount by the number of occupied ILUs in 1997 and 1998 to arrive at an allocation amount per residence. Petitioners did not explain or introduce credible evidence how Mr. Baker arrived at the specific allocation percentages for each expense category or the relevance of those specific categories.

Although we are permitted in certain circumstances to estimate a deductible amount, <u>Cohan v. Commissioner</u>, 39 F.2d 540, 543-544 (2d Cir. 1930), we can only do so when the taxpayer provides evidence sufficient to establish a rational basis upon which an estimate can be made, <u>Vanicek v. Commissioner</u>, 85 T.C. 731, 743 (1985).  In this case, even assuming that all other requirements for deductibility under section 213 have been established, petitioners have failed to provide evidence upon which we can make a rational estimate.  Additionally, we note that the facilities were available for recreational use by petitioners and their family, and petitioners have failed to establish what portion of Mr. Baker's use was for medical purposes.  Accordingly, we hold that petitioners are not entitled to deductions for Mr. Baker's use of the pool, spa, and exercise facilities.

Contentions we have not addressed are moot, irrelevant, or meritless.  To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

APPENDIX

I.   <u>1997</u>

| <u>Total Costs</u> | <u>Amount</u> |
|---|---|
| Total expenses | $16,069,104 |
| Issue cost | (98,395) |
| SNF noncontract patient fees | (1,207,747) |
| ALU noncontract patient fees | (80,156) |
| SCU noncontract patient fees | (3,640) |
| SNF ancillary services, Medicare, and HMO billings for noncontract patients | (448,462) |
| Total costs | 14,230,704 |

| <u>Medical Expenses</u> | <u>Amount</u> |
|---|---|
| SNF operating expenses | $3,044,041 |
| ALU and SCU operating expenses | 929,275 |
| Emergency pull-cord system | 87,374 |
| Food service adjustment | 482,769 |
| Environmental service adjustment | 112,617 |
| Utilities adjustment | 81,146 |
| Insurance adjustment | 18,234 |
| Interest expense for SNF | 479,734 |
| Interest expense for ALU | 319,823 |
| Interest expense for SCU | 159,991 |
| SNF noncontract patient fees | (1,207,747) |
| ALU noncontract patient fees | (80,156) |
| SCU noncontract patient fees | (3,640) |
| SNF ancillary services, Medicare, and HMO billings for noncontract patients | (448,462) |
| Medical expenses | 3,974,999 |

Medical expenses divided by total costs equals an allocation percentage of 27.93 percent.

The number of ILU residents was 574 and they paid a total annual service fee of $7,979,906, or an average of $13,902.

Applying the allocation percentage of 27.93 percent to the weighted average annual service fee of $13,902 results in a medical care allocation of <u>$3,883 per resident</u>.

II.  <u>1998</u>

| <u>Total Costs</u> | <u>Amount</u> |
|---|---|
| Total expenses | $16,986,770 |
| Issue cost | (107,134) |
| SNF noncontract patient fees | (1,301,382) |
| ALU noncontract patient fees | (104,083) |
| SCU noncontract patient fees | (110,202) |
| SNF ancillary services, Medicare, and HMO billings for noncontract patients | (378,905) |
| Total costs | 14,985,064 |

| <u>Medical Expenses</u> | <u>Amount</u> |
|---|---|
| SNF operating expenses | $3,330,031 |
| ALU and SCU operating expenses | 1,780,639 |
| Emergency pull-cord system | 88,257 |
| Utilities adjustment | 103,641 |
| Interest expense for SNF | 470,432 |
| Interest expense for ALU | 313,778 |
| Interest expense for SCU | 313,778 |
| SNF noncontract patient fees | (1,301,382) |
| ALU noncontract patient fees | (104,083) |
| SCU noncontract patient fees | (110,202) |
| SNF ancillary services, Medicare, and HMO billings for noncontract patients | (378,905) |
| Medical expenses | 4,505,984 |

Medical expenses divided by total costs equals an allocation percentage of 30.07 percent.

The number of ILU residents was 591 and they paid a total annual service fee of $8,329,241, or an average of $14,093.

Applying the allocation percentage of 30.07 percent to the weighted average annual service fee of $14,093 results in a medical care allocation of <u>$4,238 per resident</u>.