T.C. Memo. 2008-298


UNITED STATES TAX COURT


WILLIAM C. AND CRISTINA LOWE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15592-06.                    Filed December 29, 2008.


        In 1985, P husband (H) invested in DA, a limited
partnership engaged in renting real estate, and he
retained that investment until DA's termination in
2003.  DA generated losses in every year of its
existence except 1995 and 2003.  On the basis of a 1985
conversation with his return preparer, H believed the
losses to be nondeductible, although the 1991 and 1993
losses were deducted on his returns for those years.
Frequent job changes caused H to move several times
after 1993, but, because he believed DA would continue
to generate nondeductible losses, he (1) did not advise
DA of his changes of address, (2) never received the
1994-2003 Schedules K-1 from DA and, therefore, was
unable to continue his prior practice of turning over
the Schedules K-1 to his return preparers, and (3) did
not report the gains and losses reflected on those
Schedules K-1.  The 1994 and 1996-2003 returns confirm
that Ps reported neither the 2003 gain nor the losses
for the other years.  The parties stipulate that Ps did
not report the 1995 gain.  Ps were unable to furnish
copies of the 1985-90 and 1992 returns.  R alleges that
Ps are taxable on $292,853 of unreported long-term
capital gain reflected on the 2003 Schedule K-1 issued
to H by DA.  Ps allege that, pursuant to sec. 469(b)

and (g), I.R.C., they may carry forward $484,065 of suspended passive activity losses from 1985-90, 1992, 1994, and 1996-2002 as a complete offset to the unreported 1995 and 2003 gains. R also determined that Ps are liable for the sec. 6662, I.R.C., accuracy-related penalty.

1. Held: The 1994 and 1996-2002 losses constitute suspended passive activity losses, and the excess of those losses over the unreported 1995 gain may be carried forward as a partial offset to Ps' unreported 2003 long-term capital gain from DA.

2. Held, further, Ps have not produced credible evidence that there are any suspended passive activity losses from 1985-90 or 1992 available for carryover to 2003, and, therefore, no carryover from those years is permitted.

3. Held, further, R's penalty against Ps is sustained, in part, under sec. 6662, I.R.C.

Patrick J. O'Brien, for petitioners.

Kelly R. Morrison-Lee, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge: By notice of deficiency dated May 9, 2006, respondent determined a deficiency in petitioners' 2003 Federal income tax of $69,351 and an accuracy-related penalty of $13,870.20. Petitioners assign error to both of those determinations. The issues for decision are (1) the extent, if any, to which there exist unused or suspended passive activity losses arising in taxable years before 2003 and attributable to petitioner William C. Lowe's (Mr. Lowe's) interest in a real estate limited partnership that, pursuant to section 469(b) and

(g),[1] are available to petitioners as offsets to the unreported 2003 long-term capital gain Mr. Lowe realized upon the termination of his investment in the partnership, and (2) whether petitioners are liable for the accuracy-related penalty under section 6662(a).

The notice contains certain other adjustments that are purely computational. Their resolution depends upon our resolution of the first issue in dispute.

FINDINGS OF FACT[2]

Some facts are stipulated and are so found. The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference.

At the time the petition was filed, petitioners resided in Lake Forest, Illinois.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Pursuant to Rule 151(e)(3), each party, in the answering brief, is required to "set forth any objections, together with the reasons therefor, to any proposed findings of any other party". Petitioners have filed an answering brief, but they have failed to set forth objections to respondent's proposed findings of fact. Accordingly, we must conclude that petitioners have conceded that respondent's proposed findings of fact are correct except to the extent that those findings are clearly inconsistent with either evidence in the record or petitioners' proposed findings of fact. See, e.g., Jonson v. Commissioner, 118 T.C. 106, 108 n.4 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).

Mr. Lowe's Background and Job History

Mr. Lowe earned a B.S. in physics from Lafayette College in 1962. He then was employed by IBM as an engineer and, by 1985, had become a corporate vice president and president of IBM's entry systems division. Although his formal training was in physics, he had some responsibilities for business decisions in his area. In general, however, Mr. Lowe depended upon the chief financial officer to support the financial decisions relating to the products with which he was concerned.

During 1985, Mr. Lowe resided in Chappaqua, New York. He became an executive for Xerox Corp. in 1988 and remained at Xerox until 1991. During that period, he continued to reside in Chappaqua. He then embarked upon a series of job changes and relocations: In 1991, he became the chief executive officer (CEO) of Gulfstream Aerospace in Savannah, Georgia, and he moved to Hilton Head, South Carolina; in 1993, he became the CEO of New England Business Services in Groton, Massachusetts, and he moved to Concord, Massachusetts; and, in 1996, he became executive vice president, North America, for Moore Corp., headquartered in Lake Forest, Illinois, which became his new place of residence. Then, in late 1998 or early 1999, petitioner Cristina Lowe's (Mrs. Lowe's) mother passed away, and petitioners moved to Tucson, Arizona, to be with Mrs. Lowe's father. In 2004, petitioners moved back to Lake Forest, Illinois.

Mr. Lowe's Investment in Douglas Associates

In 1985, while Mr. Lowe was at IBM, a financial adviser from Chase Bank, used by Mr. Lowe and a number of other IBM executives, advised Mr. Lowe to get involved in some limited partnerships.  He specifically recommended that Mr. Lowe invest in Douglas Associates, a limited partnership engaged in renting real estate.  Thereupon, Mr. Lowe invested $200,000 in Douglas Associates in exchange for a limited partnership interest.

Douglas Associates issued Schedules K-1, Partner's Share of Income Credits, Deductions, etc. (the Schedules K-1), to Mr. Lowe for each year of its existence (1985-2003), and Mr. Lowe retained his limited partnership interest in Douglas Associates for that entire period.  The Schedules K-1 reported Mr. Lowe's annual share of Douglas Associates' gains and losses as follows:

| Year | Gain (Loss) |
|------|-------------|
| 1985 | ($7,961) |
| 1986 | (31,817) |
| 1987 | (61,526) |
| 1988 | (71,581) |
| 1989 | (63,587) |
| 1990 | (58,029) |
| 1991 | (49,152) |
| 1992 | (49,336) |
| 1993 | (46,596) |
| 1994 | (43,615) |
| 1995 | 107,580 |
| 1996 | (15,102) |
| 1997 | (15,469) |
| 1998 | (16,667) |
| 1999 | (14,257) |
| 2000 | (20,645) |
| 2001 | (6,638) |

| | |
|---|---|
| 2002 | ($7,835) |
| 2003 | [1]292,853 |

[1] The 2003 Schedule K-1 (which covered Douglas Associates' final taxable year, ending July 15, 2003) also reported that Mr. Lowe's share of unrecaptured depreciation gain from "flow through entity" was $109,913. Respondent does not argue that that amount reduces the amount of suspended passive activity losses that may be available to offset the $292,853 long-term capital gain Mr. Lowe realized upon the termination of his investment in Douglas Associates. Therefore, we will ignore that amount in determining the amount of suspended passive activity losses, if any, available for that purpose.

The 1985 and 1986 Schedules K-1 reported Mr. Lowe's losses for those years on line 1, "Ordinary income (loss)". The Schedules K-1 for all subsequent years (1987-2003) reported his gains or losses on the line entitled "Reconciliation [or 'Analysis'] of partner's capital account", and/or that entitled "Income [or 'Net income'] (loss) from rental real estate activities".

Mr. Lowe received the 1985-93 Schedules K-1 and turned them over to his tax return preparer. Having failed to notify Douglas Associates of his various changes of address between 1994 and 2003, Mr. Lowe did not receive any of the Schedules K-1 issued for those years.[3]

---

[3] The 1998-2002 Schedules K-1 were addressed to Mr. Lowe at his address in Lake Forest, Illinois, which indicates that someone had advised Douglas Associates that Mr. Lowe resided at that address. Presumably, Mr. Lowe's failure to receive them is attributable to petitioners' late 1998 or early 1999 move from Lake Forest to Tucson, Arizona. The 2003 Schedule K-1 was mistakenly addressed to Mr. Lowe at a different address in Lake Forest, Illinois, at a time when petitioners were still residing in Tucson.

Tax Reporting of the Gains and Losses Reflected on the
Schedules K-1

Mr. Lowe reported the losses attributed to him on the 1991
and 1993 Schedules K-1 (jointly with his former spouse for 1991
and jointly with Mrs. Lowe for 1993) as currently deductible on
the returns filed for those years.  On the joint returns
petitioners filed for 1994 through 2003, they reported neither
the gains, for 1995 and 2003, nor the losses, for the other
years, reflected on the Schedules K-1 for those years.  Mr. Lowe
was unable to obtain copies of his 1985-90 and 1992 returns, and
those returns are not in evidence.[4]

Mr. Lowe's 1985-92 returns were prepared by Joseph Cannistra
& Co., in Mount Kisco, New York.  His 1993-2003 returns were
prepared by at least six different tax preparers, generally
located near his residence, which, as noted supra, changed
several times during those years.

OPINION

I.  Petitioners' Entitlement to a Passive Activity Loss Carryover

A.  Applicable Law

Section 469, dealing with passive activity losses and
credits, was added to the Internal Revenue Code by section 501 of
the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, sec. 501, 100
Stat. 2233.  Theretofore, there had been no generally applicable
limitation on a taxpayer's ability to use losses from a

---

[4] The 1995 return is also not in evidence, but the parties
stipulate that petitioners did not report on that return the
$107,580 gain reported on the Douglas Associates 1995 Schedule K-
1.

particular trade or business activity to offset income from other such activities.  That circumstance gave rise to the proliferation of tax shelters permitting taxpayers to reduce or avoid taxes on salary or other positive income through the use of losses (often in excess of real economic costs) incurred in advance of any income from the shelters.  See H. Conf. Rept. 99-841 (Vol. II) at II-137 (1986), 1986-3 C.B. (Vol. 4) 1, 137; S. Rept. 99-313, at 713 (1986), 1986-3 C.B. (Vol. 3) 1, 713.

In pertinent part, section 469(a)(1) provides that an individual's "passive activity loss" for any taxable year shall not be allowed.  Section 469(c)(1) defines a "passive activity" as one which involves the conduct of any trade or business in which the taxpayer does not materially participate.[5]  Section 469(d)(1) defines a passive activity loss as the amount, for the taxable year, by which aggregate losses from all passive activities exceed aggregate income from those activities.  Thus, losses arising from a passive activity are deductible only against income from that activity or another passive activity. See S. Rept. 99-313, supra at 722, 1986-3 C.B. (Vol. 3) at 722. Section 469(b) provides that any passive activity loss disallowed under subsection (a) shall be treated as a deduction allocable to that same passive activity in the next taxable year.  If the

---

[5] With exceptions not here relevant, an individual is not treated as materially participating in any activity of a limited partnership of which he is a limited partner (e.g., Mr. Lowe is not treated as materially participating in Douglas Associates' activities).  See sec. 469(h)(2); sec. 1.469-5T(e), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).

carried-over passive activity loss becomes a nonallowable passive activity loss for the carryover year, it is carried over to the succeeding year.  Disallowed or suspended losses may be carried over indefinitely until they are used.[6]  See S. Rept. 99-313, supra at 722, 1986-3 C.B. (Vol. 3) at 722; Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 28.9, at 28-91 (3d ed. 1999).  Pursuant to section 469(g)(1)(A) and (B), if a taxpayer disposes of his entire interest in a passive activity to an unrelated person in a transaction in which all gain or loss is recognized, suspended passive activity losses (remaining after the application of section 469(b)) are deductible without limitation (i.e., they are treated as losses "not from a passive activity") in the year of disposition.[7]

Section 469 generally applies to taxable years beginning after December 31, 1986, and does not apply to losses from pre-1987 taxable years carried forward to post-1986 taxable years. TRA sec. 501(c)(1) and (2).  Section 469(m) provides a 5-year phase-in for passive activity losses from interests held before

---

[6] Because disallowed or suspended losses from a passive activity are allowable in full upon a fully taxable disposition of that activity (see discussion infra), it is necessary to determine the portion of each year's passive activity loss carryover that is allocable to each of the taxpayer's passive activities, assuming the taxpayer owns interests in more than one.  See S. Rept. 99-313, at 722 (1986), 1986-3 C.B. (Vol. 3) 1, 722; sec. 1.469-1(f)(4)(i), Income Tax Regs.; sec. 1.469-1T(f)(2), Temporary Income Tax Regs., 53 Fed. Reg. 5706 (Feb. 25, 1988).

[7] In this case, the nonpassive activity loss characterization would apply only to the extent Mr. Lowe's suspended loss carryover exceeded his unreported capital gain on the disposition of his interest in Douglas Associates.

the new law's date of enactment, October 22, 1986, pursuant to which an increasing percentage of such losses becomes subject to the new rules, with 100 percent of such losses becoming subject thereto for taxable years beginning in or after 1991.

B.  Arguments of the Parties

Petitioners argue that the losses set forth on the Schedules K-1 issued to Mr. Lowe by Douglas Associates for 1985-90, 1992, 1994, and 1996-2002, totaling $484,065, and from which they "have received no tax benefit",[8] are passive activity losses, which "more than offset any gains from Douglas Associates"; i.e., the 1995 and 2003 gains totaling $400,433.[9]

Respondent argues:  "Because petitioners have failed to substantiate the transactions surrounding the alleged passive activity losses * * * , petitioners cannot satisfy the statutory requirements for carrying forward suspended * * * [passive activity losses]".  He concludes that those alleged losses "cannot be properly carried forward because they are not suspended * * * [passive activity losses] pursuant to * * *

---

[8] The parties stipulate (and the 1991 and 1993 returns verify) that the losses reported on the 1991 and 1993 Schedules K-1 were deducted as nonpassive or "active" losses, and petitioners concede that the alleged passive activity loss carryover is "net of claimed active losses".

[9] Petitioners do not dispute the status of the unreported 1995 gain as an offset to their alleged suspended passive activity loss carryover to 2003.  What they seek is to "apply all passive * * * [losses] (net of claimed active losses and unreported gains) to offset any tax liability for 2003." (Emphasis supplied.)

[section] 469." Alternatively, respondent argues that, even if we decide that the losses set forth on the 1994 and 1996-2002 Schedules K-1, totaling $140,228, constitute suspended passive activity losses available as a carryover,[10] they must be offset by the unreported 1995 gain of $107,580, leaving only $32,648 in suspended passive activity losses as an offset to the unreported 2003 gain of $292,853, resulting in net unreported gain of $260,205.

### C. Burden of Proof

In pertinent part, Rule 142(a)(1) provides, as a general rule: "The burden of proof shall be upon the petitioner". In certain circumstances, however, if the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the proper tax liability, section 7491 places the burden of proof on the Commissioner. Sec. 7491(a)(1); Rule 142(a)(2). Credible evidence is evidence that, after critical analysis, a court would find constituted a sufficient basis for a decision on the issue in favor of the taxpayer if no contrary evidence were submitted. Baker v. Commissioner, 122 T.C. 143, 168 (2004); Bernardo v. Commissioner, T.C. Memo. 2004-199 n.6. Section 7491(a)(1) applies only if the taxpayer complies with substantiation requirements, maintains all required records, and cooperates with the Commissioner's requests for witnesses,

---

[10] As explained infra sec. I.D., respondent believes that petitioners' duty to be consistent forecloses their claim that the 1985-93 losses are available to offset their unreported 2003 passive activity gain.

information, documents, meetings, and interviews.  Sec. 7491(a)(2).

For the reasons discussed <u>infra</u> section E.3.a., we find that petitioners have failed to introduce credible evidence that any of the losses reflected on the Schedules K-1 for 1985-90 and 1992 (the pre-'93 losses) constitute suspended passive activity losses.  It follows that petitioners retain the burden of proving that those losses are available to offset their 2003 gain on the disposition of Mr. Lowe's interest in Douglas Associates, a burden that, because of the absence of credible evidence on that issue, petitioners cannot sustain.  See <u>Bernardo v. Commissioner</u>, <u>supra</u> n.7; see also <u>Rendall v. Commissioner</u>, 535 F.3d 1221, 1225 (10th Cir. 2008) (citing <u>Bernardo v. Commissioner</u>, <u>supra</u>), affg. T.C. Memo. 2006-174.  Therefore, our discussion of that issue may be viewed as setting forth the basis for our determination that petitioners have failed to (1) introduce credible evidence and (2) carry their burden of proof.  See <u>Bernardo v. Commissioner</u>, <u>supra</u>; see also <u>Rendall v. Commissioner</u>, <u>supra</u> at 1225.

The parties also disagree as to the status of the losses reflected on the Schedules K-1 for 1994 and 1996-2002 (the post-'93 losses) as suspended passive activity losses.  We need not decide whether section 7491(a) applies to that issue because we resolve it upon a preponderance of the evidence.  Therefore, resolution of the issue does not depend upon which party bears the burden of proof.  See, e.g., <u>Bergquist v. Commissioner</u>, 131 T.C. __, __ (2008) (slip op. at 30).

D.  Respondent's Motion for Leave To File
Amendment to Answer To Conform to the Evidence

On January 31, 2008, respondent moved, pursuant to Rule 41(b), for leave to file an amendment to the answer to conform to the evidence (the motion).  In the motion, respondent raises the duty of consistency as an affirmative defense to what he considers petitioners' attempt to characterize the 1985-93 losses, alleged by respondent to have been reported as active losses on the 1985-93 returns,[11] as suspended passive activity losses available to offset their unreported 2003 passive activity gain.[12]  Petitioners oppose the motion.

We need not rule upon the motion because, as noted supra, we find that petitioners have failed to introduce credible evidence that the pre-'93 losses constitute suspended passive activity losses.  That finding, together with the parties' stipulation that petitioners reported the 1991 and 1993 losses as active losses (so that petitioners concede they may not be carried forward as suspended passive activity losses) renders moot respondent's motion, which, in substance, seeks the same result.

---

[11] As noted supra note 8, the parties stipulate that the losses reported on the 1991 and 1993 Schedules K-1 were deducted as active losses for those years.

[12] The "Amendment To Answer" filed with the motion erroneously refers to "passive gains in 2004".

- 14 -

E.  Discussion

   1.  Introduction

The parties' joint exhibits include copies of petitioners' 1994 and 1996-2002 returns.  Those returns show that petitioners did not report or deduct the post-'93 losses.  Petitioners' tax treatment of the pre-'93 losses is not evidenced by copies of returns filed for those years.  The only support for petitioners' argument that those losses were never deducted and, therefore, remain available for carryover to 2003 is Mr. Lowe's testimony to that effect.  Because of that evidentiary difference, we separately consider those two groups of alleged passive activity losses.

   2.  The Post-'93 Losses

      a.  Analysis

Respondent states that petitioners have failed to provide a "valid explanation as to why * * * [Mr. Lowe] invested in Douglas Associates" and that Mr. Lowe "failed to explain why he had very limited records relating to his roughly 20-year participation in" that partnership and why he never inquired further relating to his $200,000 investment therein.  Respondent concludes:  "Because petitioners have failed to substantiate the transactions surrounding the alleged passive activity losses * * * [they] cannot satisfy the statutory requirements for carrying forward suspended * * * [passive activity losses]."  Respondent also cites a taxpayer's right, under section 469(g)(1), to carry forward suspended passive activity losses to the year in which

the taxpayer disposes of his entire interest in the passive activity to an unrelated party, provided all gain or loss on the disposition is recognized. He then states: "[Mr. Lowe] has not substantiated that this [i.e., that there is a suspended loss] is true for any of the * * * [passive activity losses], and thus, [he] cannot carry any of * * * [them] forward." (Emphasis supplied.) We disagree as regards the post-'93 losses.

Mr. Lowe testified that he invested in Douglas Associates upon the advice of a financial adviser who provided investment advice to IBM executives like him. The adviser suggested that he become involved in limited partnerships and, specifically, that he invest in Douglas Associates. The parties have stipulated that from 1985 through 2003 Douglas Associates was a limited partnership engaged in the activity of renting real estate, and that Mr. Lowe held a limited partnership interest therein. According to the Schedules K-1 issued by Douglas Associates, which are unchallenged, Mr. Lowe's investment in Douglas Associates did give rise to the alleged losses (both pre- and post-'93), and the 1994 and 1996-2002 returns provide unchallenged verification that the post-'93 losses were not claimed on those returns and did not give rise to any tax benefit to petitioners before 2003. Moreover, pursuant to section 469(c)(1) and (h)(2) and section 1.469-5T(e), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988), which, together, establish that Mr. Lowe's limited partnership interest in Douglas Associates constituted a passive activity, it is clear that the

post-'93 losses constituted passive activity losses.  Lastly,
there is no dispute that all of the other requirements of section
469(g)(1) for carrying forward the post-'93 losses to offset the
2003 capital gain on termination of Mr. Lowe's interest in
Douglas Associates have been met.  Respondent does not dispute
that, as reflected on the 2003 Schedule K-1, the partnership was
terminated in a fully taxable transaction, and respondent does
not allege that that termination constituted a "disposition [of
the limited partnership interests] involving [a] related party"
within the meaning of section 469(g)(1)(B).

### b.  Conclusion

The post-'93 losses constitute suspended passive activity
losses that may be carried forward to 2003 pursuant to section
469(b) and (g)(1)(A).

### 3.  The Pre-'93 Losses

#### a.  Analysis

Because the 1985-90 and 1992 returns are not in evidence,
petitioners' position that the pre-'93 losses constitute
suspended passive activity losses available for carryover to 2003
is based solely upon Mr. Lowe's testimony.  That testimony is not
persuasive.

Mr. Lowe testified that, beginning with his receipt of the
1985 Schedule K-1, his "process was to turn * * * [the Schedules
K-1] over to my tax preparer, who I depended upon to deal with

them properly and put my returns in proper form."[13]  He further testified that the C.P.A. firm that prepared his 1985 return (as well as all subsequent returns through 1992) told him that the 1985 loss was a "passive loss", that he could not "do anything with" the loss, and that his "expectation from that point forward was that's the way they would be treated".  Mr. Lowe expressed his "belief" that the 1985-90 losses reflected on the Schedules K-1 for those years "were never claimed", and that the same was true for 1992.  He had no explanation as to why the 1991 and 1993 losses were reported as "active losses" on the returns for those years, and he testified that "it was a surprise to me to discover that those losses had been claimed."

Mr. Lowe's testimony that the pre-'93 losses were not claimed is implausible in several respects.  To begin with, before the enactment of section 469 in 1986, the concept of active versus passive losses did not exist for deductibility purposes, and, with the exception of the section 1211(b) limitations on the deductibility of capital losses, losses incurred by an individual in connection with a trade or business or in a transaction entered into for profit were fully deductible under section 165(c)(1) and (2).  Moreover, as noted supra section I.A., section 469 did not become effective until 1987; and, until 1991, it only affected a portion of the losses from preenactment investments such as Mr. Lowe's interest in Douglas

---

[13] Mr. Lowe's practice of turning over the Schedules K-1 to his accountants of course ceased after 1993 when he no longer received any from Douglas Associates.

Associates.  Lastly, the Schedules K-1 for 1985 and 1986 listed the losses for those 2 years on a line entitled "Ordinary income (loss)".[14]  Under those circumstances, we find incredible Mr. Lowe's testimony that his professional tax-advisor (1) did not deduct the losses reflected on the Schedules K-1 for 1985 and 1986 and (2) told him, in connection with the preparation of his 1985 return, that the 1985 loss was a "passive loss" and that he "couldn't do anything with it."

Petitioners' argument that the pre-'93 losses subject to section 469, in whole or in part (1987-92), were not deducted is not based upon the returns for those years (which are not in evidence) or even upon Mr. Lowe's recollection based upon his prior review of those returns but, instead, upon his "belief" that those losses "were never claimed".  That belief, based upon an alleged conversation that took place some 22 years earlier, is belied by the 1991 return, which shows that the firm responsible for preparing the 1985-92 returns treated the loss reflected on the 1991 Schedule K-1 as a deductible, ordinary loss.  The 1991 return, at the very least, implies that neither the return preparer nor the reviewer(s) (if any) were aware of the section 469 limitations on the deductibility of passive activity losses, and that they, therefore, continued to deduct in full, after

---

[14] For subsequent years, the Schedules K-1 listed Mr. Lowe's pass-through gain or loss on a line entitled "Income [or 'Net income'] (loss) from rental real estate activities" and/or on a line entitled "Reconciliation of partner's capital account".

1986, the losses reflected on the Schedules K-1.[15]  On the other hand, if we assume that Mr. Lowe's return preparers applied section 469 to Mr. Lowe's passive activity losses reflected on the Schedules K-1 for 1987-90 and 1992, including the phase-in rules of section 469(m) applicable to 1987-90, there is no evidence of the extent to which those passive activity losses may have been used as offsets to passive activity income or gain from interests other than Mr. Lowe's interest in Douglas Associates, thereby making them unavailable for carry forward to 2003.[16]

### b.  Conclusion

Mr. Lowe has not provided credible evidence of the existence of pre-'93 passive activity losses available for carry forward to 2003 pursuant to section 469(b) and (g)(1)(A).

### F.  Conclusion

Petitioners may carry forward to 2003 post-'93 losses of $32,648.

---

[15] The ordinary loss treatment in 1993 by a new return preparer of the loss reflected on the 1993 Schedule K-1 is, perhaps, explainable if we assume that that preparer followed the questionable practice of treating the Schedule K-1 loss for 1993 just as the Schedule K-1 losses had been treated by the prior return preparer for prior years.  Of course, that practice, if it existed, necessarily stopped, beginning in 1994, when Mr. Lowe stopped receiving Schedules K-1 from Douglas Associates and, therefore, was unable to furnish them to his return preparers.

[16] The 1991 and 1993 returns, both of which reflect investments in partnerships other than Douglas Associates, indicate that Mr. Lowe may very well have maintained such investments during the entire 1987-92 period.

II.  Section 6662(a) Penalty

    A.  Applicable Law

Section 6662(a) provides for a penalty equal to 20 percent of the portion of any underpayment of tax attributable to, among other things, negligence or intentional disregard of rules or regulations (without distinction, negligence), any substantial understatement of income tax, or any substantial valuation misstatement.  See sec. 6662(b)(1)-(3).  Although the notice states that respondent bases his imposition of the penalty of $13,870.20 on "one or more" of the three above-referenced grounds, on brief he relies upon only the first two of those grounds: negligence and substantial understatement of income tax.

Negligence has been defined as lack of due care or failure to do what a reasonably prudent person would do under like circumstances.  See, e.g., Hofstetter v. Commissioner, 98 T.C. 695, 704 (1992).  It also "includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return."  Sec. 1.6662-3(b)(1), Income Tax Regs.

For individuals, a substantial understatement of income tax exists "if the amount of the understatement for the taxable year exceeds the greater of--(i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $5,000."  Sec. 6662(d)(1)(A).

Section 6664(c)(1) provides that the accuracy-related penalty shall not be imposed with respect to any portion of an underpayment if it is shown that there was reasonable cause for that portion and the taxpayer acted in good faith with respect to that portion.  Further:

> The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. * * * Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of * * * law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer. * * * [Sec. 1.6664-4(b)(1), Income Tax Regs.]

B.  Analysis

Even with a $32,648 offset to petitioners' unreported capital gain for 2003, it is clear that there was a substantial understatement of petitioners' 2003 income tax within the meaning of section 6662(d)(1)(A).[17]  Alternatively, we find that that understatement was attributable to negligence, within the meaning of section 6662(c), on Mr. Lowe's part.  He did not exercise due care or do what a reasonably prudent person would do; rather, he adopted an attitude of total indifference to his investment in

---

[17] Mr. Lowe Petitioners' taxable unreported long-term capital gain for 2003 as determined herein is $260,205 ($292,853 - $32,648).  Applying the 15-percent maximum capital gain rate under sec. 1(h)(1)(C) applicable to net capital gain realized in taxable years ending on or after May 6, 2003, petitioners' understatement of tax attributable to that gain is $39,031 (15 percent of $260,205).  That understatement exceeds $5,000 and 10 percent of the tax required to be shown on petitioners' 2003 return, which, as computed by respondent is $71,820, an amount that, presumably, will be reduced by our allowance of a portion of the passive activity loss carryover claimed by petitioners.

Douglas Associates. That indifference caused him not to notify Douglas Associates of his various changes of address after 1993, and that inaction resulted in his not receiving the 2003 Schedule K-1 or including, on his 2003 return, the long-term capital gain of $292,853 reflected on that Schedule K-1. Mr. Lowe's stated assumption that Douglas Associates would perpetually generate nondeductible losses (so that there was no reason for him to make certain that he would receive the Schedules K-1 after he changed his address in 1993) was not a reasonable or prudent assumption, even if it was based upon advice from a professional tax return preparer. The reasonableness of Mr. Lowe's predicating such an assumption upon that advice is undercut by his testimony that the advice related only to the initial year of the investment, 1985, a year which preceded the effective date of the passive loss provisions, and that it was his own "expectation from that point forward" that the losses would continue to be nondeductible. Moreover, it was not reasonable for an individual of Mr. Lowe's background and experience to make a $200,000 investment with the sole expectation that it would do no more than generate perpetual losses of no economic benefit to him. He knew, or should have known, that Douglas Associates owned real estate of some potential value, which might be sold at some time, and that such a sale, in part because of the property's depreciated tax basis, might produce a taxable gain to the investors. For that reason alone Mr. Lowe was negligent in turning his back on the Schedules K-1.

The same reasons that form the basis for our finding that petitioners' underpayment of the 2003 tax liability was attributable to Mr. Lowe's negligence also form the basis for our finding that there was no reasonable cause for that underpayment, and that Mr. Lowe failed to act in good faith with respect thereto.  See sec. 6664(c)(1).

C.  Conclusion

Petitioners are liable for the section 6662(a) penalty as applied to the underpayment of tax determined herein.

To reflect the foregoing,

Decision will be entered under Rule 155.